[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 259 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 261 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 262 
Any individual may lay out a way or thoroughfare through his own land; and may dedicate it as such to the public use. But such dedication does not impose upon the towns in which the lands lie, the duty of improving or of keeping in repair as a public highway the land so dedicated. This will conclusively appear from a reference to the provisions which have been in force in our highway acts for half a century. The power of laying out, altering and discontinuing highways has been conferred exclusively on the commissioners of highways *Page 264 
of the respective towns. It has been their duty to cause to be described and recorded in the town clerk's office all public highways not already on record; to assess the highway labor upon the inhabitants of the town; to divide the town into road districts; and to assign a due proportion of the labor to each district. It was the evident intent of these statutes that the labor assessed should be bestowed exclusively upon the highways established by the town authorities and recorded in the town clerk's office. The duty of causing roads to be described and recorded evidently applied to such roads as had previously been laid out by public authority, and to such as had been used as highways for twenty years; and not to roads which had been laid out by individuals on their own lands. The whole structure of the highway acts forbids the idea that the town is bound to adopt and to keep in repair every road which an individual may think proper to open through his own land, although he may dedicate it to public use in such manner as to preclude himself from shutting it up. Streets and roads dedicated by individuals to public use but not adopted by the local public authorities, or declared highways by statute, are not highways within the meaning of the highway acts; and there is no law by which any one can be compelled to keep them in repair. The English cases cited by the plaintiff's counsel on this point are inapplicable. In Underwood v.Stuyvesant, (19 John. 186,) Petrus Stuyvesant had surveyed and laid out a tract of land within the city of New-York, into city lots and streets, and had sold or leased part of the lots with reference to the survey. Mr. Justice Platt, in delivering the opinion of the court, said, "We must intend that every person knew that those streets "could not be established as public streets of the city, unless "they were sanctioned by the corporation or other public agents." But it is unnecessary to look for authorities beyond the highway acts. They point out the only mode by which highways chargeable upon the public can be created.
On the 9th of April 1811, the lands on the east side of the Oswego river, now part of the city of Oswego, were part of the *Page 265 
town of Fredericksburgh, (afterwards Scriba,) and belonged to the state. On that day an act was passed directing the surveyor general to lay out a portion of those lands into proper streets and house lots, and so as to form in the most convenient place, a public square, and to make a map thereof, c. and the commissioners of the land office were directed to sell, from time to time, so many of the lots as they should deem most advantageous to the state. (Laws of 1811, ch. 231.) In 1814 the lands were re-surveyed, and in 1815 several of the lots thus laid out, were sold by the state to individuals. The streets were thus dedicated to the public use; but the statute directing the survey and sale, did not declare the streets so dedicated to be public highways, nor did the town of Scriba, by any act of its officers, adopt them as such.
In laying out the village plot, and in selling the building lots, the state acted as the owner and proprietor of the land; and the effect of the survey and sale, in reference to the streets laid down on the map, was the same as if the survey and sale had been made by a single individual.
Under these circumstances the Oswego Canal Company was incorporated in 1823. The objects of the incorporation were partly private and partly public. The company was authorized to construct the canal under the superintendence of an engineer to be appointed by the canal commissioners, and subject to their direction. The company was empowered, after the completion of the canal to sell, let, grant and convey its waters for mills or other hydraulic purposes. The state reserved to itself the right of adopting the canal as a part of the contemplated improvement between Lake Ontario and the Erie canal, and to make use of its waters for filling the locks that might be constructed to connect the canal with the lake, and thereafter the canal was to become the property of the state, without any compensation, except that the company was to be entitled to the surplus waters not necessary for filling the locks to be constructed by the canal commissioners. For the purpose of making the canal, the company was authorized to enter upon and take the necessary *Page 266 
lands; and the damages for lands thus taken, or for lands injured by the necessary operations to complete the work, were to be paid by the company. The act imposed no duty upon the company to build or maintain bridges across it. The canal was completed in 1826. It passed across a number of the streets, laid down upon the map made in pursuance of the directions of the act of 1811; but it does not appear by the case to have crossed any public highway laid out by the authority of the town in which it lay. In 1828, the village of Oswego was incorporated, including the canal within its territorial limits. All the streets laid out for public uses therein, as the same were designated in the plot thereof, filed in the office of the secretary of state, were, by the twelfth section of the act, declared public highways. The village was divided by the act into two road districts, with power to the trustees to subdivide them. The districts were exempted from the authority of the commissioners of highways of the towns of Oswego and Scriba; and the trustees of the village were clothed with the powers, and charged with the duties of the commissioners of highways. The map referred to in this section of the statute is understood to be the map made by Randall, in accordance with which the sales of the village lots were made by the state.
Cayuga and Seneca-streets first became public highways when the village was incorporated. They were not so when the canal was made. The construction of the canal was a lawful act. If any damage arose from it to the proprietors of the lands within the plan of the village as laid out by the surveyor-general, the sixth and seventh sections of the act incorporating the canal company provides a mode in which it might have been appraised and paid for. If the construction and maintenance of the canal deprived any of them of their easement in the land derived from its dedication, it was a proper subject of appraisal, and this appears to have been their only remedy. As respects the village subsequently incorporated, the canal is to be regarded, so far as respects the burthen of building bridges across it, as if it had been a natural stream. It had an actual and lawful existence when the village corporation was created, and no new *Page 267 
obligations were imposed upon the canal company by the village charter.
Having thus come to the conclusion that the plaintiffs were rightly nonsuited upon the merits of the case, it is unnecessary to notice the other points made on the argument.
The judgment of the supreme court should be affirmed.