(67 App. Div. 104.)

BAIRD et al. v. CAMPBELL et al.

(Supreme Court, Appellate Division, First Department. December 20, 1901.)

1. TIDE LANDS—FLOODING AT ORDINARY TIDE—EVIDENCE.

It was in issue whether a certain marsh bordering on the Harlem river was, before it was filled in, covered with water at ordinary high tide. A witness testified that the marsh, which grew salt hay, was covered with water at extraordinary high tide in the spring equinox and during strong east winds, but that ordinary high tides did not cover it; and the testimony was somewhat confirmed by the recollection of others. Several maps of the marsh were introduced, on which were lines indicating high-water line; but there was nothing to show that the maps were made from actual surveys, or that the lines indicated the high mark of daily tides. *Held*, that the evidence was sufficient to sustain a verdict finding the marsh not covered by ordinary high tides.

2. DEEDS—HARLEM PATENT—LANDS EMBRACED.

The patent of the village of Harlem, granted by Gov. Nichols in 1666, granted to the inhabitants and freeholders all land within certain limits, including marshes, meadows, and waters. In 1686 the city of New York acquired, under the Dongan charter, title to the land between high and low water mark on Manhattan Island. Subsequent to the Harlem patent the village of Harlem granted to the occupant of a farm the land comprising the same, together with a contiguous marsh on the Harlem river; the marsh bearing salt hay or sedge, and being overflowed at extraordinary high tides, but not by the ordinary daily tides. The city of New York never claimed title to the tract included in the marsh. *Held*, that owing to the character of the marsh, the terms of the Harlem patent, its contemporaneous construction by the village, and the long acquiescence of the city, the marsh would be held included in the Harlem patent, and not embraced in the Dongan patent.

3. SAME—DESCRIPTION—SUFFICIENCY.

Where a marsh south of a certain creek was a part of a farm, a conveyance of the farm, describing the same, "including all the estate of the grantors" south of the creek, conveyed the marsh.

Appeal from trial term, New York county.

Action by John S. Baird and others against Mary A. Campbell and others. From a judgment in favor of plaintiffs, and from an order denying a new trial, and from an order granting an extra allowance, Mary A. Campbell appeals. Affirmed.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN, O'BRIEN, and INGRAHAM, JJ.

John C. Shaw, for appellant.
William R. Wilder, for respondents.

INGRAHAM, J.   The action was to recover the possession of two lots of land on the east side of 1st avenue, between 103d and 104th streets, in the city of New York.   The complaint alleges that one John Baird was from the 25th of July, 1878, and down to the 17th of October, 1891, seised in fee simple and in lawful possession of the premises in question, and that he died on or about the 17th of October, 1891, leaving a last will and testament, whereby he devised the said real estate to certain trustees named in the will, upon certain trusts therein specified; that two of the trustees thereafter resigned, and two of the plaintiffs were duly appointed trustees in their place, and that the plaintiffs are now trustees under the said will, and entitled to the possession of the property in question; that on or about the 6th of September, 1892, the defendant Mary A. Campbell unlawfully entered into and upon said premises, and has ever since continued therein; and the complaint asks to recover the possession of the property, and damages for withholding the same.   The defendant Mary A. Campbell answered, denying each and every allegation of the complaint; and upon the issue . thus framed the action was brought on for trial, and the case submitted to a jury, who found a verdict in favor of the plaintiff, upon which judgment was entered, and from which judgment the defendant Mary A. Campbell appeals.

Upon the trial it appears to have been conceded that the appellant had no title to the property; that she held possession under a bargain and sale deed made by John Allen, her father, dated September 6, 1892, the consideration of which is not stated. · There was also in evidence what purported to be a bargain and sale deed, without covenants, whereby John Baird, of the city, county, and state of New York, conveyed to John Allen the premises in question, with two lots adjoining the same on the south; the consideration being the sum of $1 and other good consideration.   This deed was dated May 19, 1892, was acknowledged May 20, 1892, and was recorded May 23, 1892. ·Upon the trial it was conceded that John Baird died on the 17th of October, 1891,—more than six months before the day upon which this deed, which upon its face conveyed this property to the appellant's father, from whom she derived title, purports to have been executed.   Consequently this deed was a forgery, and under it the appellant could claim no title or right of possession.   This forged deed having been recorded on the 20th of May, Allen, the grantee therein, on the 6th of the following September attempted to convey the property described therein to the appellant, and shortly thereafter died.   The defendant, making no claim to a title to the property, and conceding that either she or her father obtained possession under a forged deed, seeks to retain such possession by attacking the title of the plaintiffs; claiming that the title is in the city of New York, although it appeared beyond dispute that the city of New York has never claimed, but for many years has disclaimed, such title.   This attempt by forgery to make an apparent paper title to the property was quite ingeniously devised, and but for the fact that the forgers made a mistake in the date of the forged deed, dating it over six months after·

the death of the person purported to be the grantor, it would, under the circumstances, have been somewhat difficult to prove the fact of the forgery. The deed was recorded, and then disappeared; the record was the only evidence of the existence of the deed; and now the person who succeeds to the title of the one entering into the possession of the property under this forged deed, making no claim to have paid anything for it, seeks to retain possession by attacking the title of those succeeding to the interest of the alleged grantor under whom her predecessor in title took possession; thus seeking to sustain the possession acquired under this forgery by showing that the person whose deed was forged was not entitled to the possession,—a position which is certainly somewhat inconsistent with her statement that she was entirely innocent of any participation in or knowledge of the forgery upon which her right to possession is based. We will assume, however, that the rule is as stated by the appellant,—that a person actually in possession of real property, no matter how such possession was acquired, cannot be ejected therefrom unless the person seeking to eject him can prove title or superior right to possession, or, in other words, that a person seeking to obtain possession of land must depend upon the strength of his own title.

In examining plaintiffs' title to the premises, we start with the concession made by defendants upon the trial that the plaintiffs' predecessor in title was the grantee in a deed from one Boyd, dated July 25, 1878, which purported to convey the premises in question in fee simple, being a full-covenant warranty deed, and that under this deed he remained in possession of the premises until the time of his death, and also with the fact, which was testified to by the appellant and her sister, that their father entered into possession under this forged deed, and that prior to the date of this forged deed he had had nothing to do with the property. The plaintiffs' predecessor in title being in possession under the deed from Boyd, before mentioned, Boyd's title to the premises at the time he executed the deed to Baird will now be considered. The premises in question was a portion of a large marsh, which originally extended from the high land which ran down to the waters of the East or Harlem river at about 93d street north to about 105th street, and westerly to what is now 3d avenue. At the north of this marsh there was a strip of upland that ran down to the river, which seems to have been about four or five hundred feet wide, bounded on the north by Mill creek, which extended westerly beyond 5th avenue. The physical condition of this marsh prior to the time that 1st and 2d avenues and Avenue A were filled in would seem to have been low, wet land, at times covered by the tide flowing in from the East or Harlem river, upon which grew salt grass or sedge, and which from the very earliest times had been used by the owner of the upland to cut sedge or salt hay, and for such other uses as were suitable to the character of the land. This marsh was intersected by several creeks into which the water flowed, and from which, it would appear, the marsh was overflowed. The evidence on the part of the plaintiffs tended to show that this marsh was only cov-

ered with water at times of extraordinary high tides, generally caused by a strong east wind which backed the water up upon the lands, and that the marsh was not covered with water at ordinary high tides. The evidence introduced by the defendants tended to show that these marshes were covered at ordinary high tides. The property, however, was distinctly a marsh land covered with salt hay or grass, upon which a person could walk, and producing an annual crop of sedge or salt hay. Strictly speaking, it was no part of the tideway of the Harlem or East river. The water flowed in through the various creeks that intersected the marsh. It seems to me there is a clear distinction, the materiality of which will appear when we consider the various grants by the British crown after the conquest of New York by the British, between what is known as a tideway along the banks of the sea, or an arm of the sea, and a large piece of marsh land like this in question, intersected by creeks, and upon which grew agricultural product, which was used by the owners of adjacent upland for the ordinary purposes for which such land can be used. There was considerable evidence introduced upon the trial as to the character of this land, and of the extent to which the ordinary ebb and flow of the tide covered it. Mr. McGown, a son of the owner of the upland, in 1835, was called as a witness for the plaintiffs. He testified that his parents had lived in a house on the strip of upland just north of these marshes, which subsequently came to be known as the "Red House"; and his testimony extends much further back than that of any of the other witnesses called in this case. His parents left this property in the year 1833, and he describes the conditions existing prior to that time. From his testimony it would appear that this marsh, upon which grew salt hay and sedge, was covered with water at the extraordinary high tide which occurs in the spring equinox, or such high tides as were caused by strong easterly winds, but that the daily ordinary tides did not cover these marshes; that during all the time that his parents occupied the premises they claimed the exclusive right to these marshes, prevented others from using them for any purpose, and used them for the ordinary purposes for which they were available,—cutting the salt grass and sedge. This testimony was somewhat confirmed by the recollections of others who had lived in the neighborhood before the land was filled in. None of the witnesses called by the defendant went back to the period about which Mr. McGown testified, and there is nothing to contradict his testimony as to the actual condition at the time about which he testified. The defendants introduced several maps in evidence, and called several surveyors and those familiar with the maps to explain them. Upon these maps this property is shown as a marsh, and upon some of them there is a line drawn as indicating the edge of the meadow or high-water line. It is not stated on any of these maps as to which high water this line referred, nor does it appear that it was anything more than a distinction between upland and marsh land. It seems to me that these maps would be entirely consistent with Mr. McGown's testimony as to the tides that overflowed this marsh. The maps fail to show that they were made from an actual survey

of the premises, or that the makers of the maps attempted to delineate thereon the line to which the daily tides extended. There would seem to be no question but that at times of extraordinary high water these marshes were covered, and I think these maps upon which so much stress is laid can be reconciled with the conditions described by Mr. McGown in his testimony, which was that these marshes were not covered with water by the ordinary daily tides. That question, however, was submitted to the jury, who found by their verdict that these marshes were not covered with water at the ordinary high tides; and, as their verdict is supported by the evidence, it should not be disturbed.

At the time of the conquest of the province of New York by the British there was located upon the lower end of the Island of Manhattan a city called "New Amsterdam," and upon the upper end of the island a village called "New Harlem." There is no record of any charter having been granted to the village of Harlem prior to the occupation by the British, but shortly thereafter a village was incorporated, and a grant made to its inhabitants by the royal governor. The question as to the rights acquired by this village thus incorporated and its inhabitants has been the subject of considerable discussion in the courts of this state, but it is now established that by the original Harlem patent a town or village was formed. This original patent was granted by Gov. Nichols in May, 1666. It recites the existence of the town or village of New Harlem; the fact that the inhabitants thereof were in occupation of their several freeholds, and for a confirmation unto the said freeholders and inhabitants in enjoyment and possession of their particular lots and estates in said town, and also for the encouragement to them in the further improvement of the said lands, the governor—

"Thought fit to ratify and confirm and grant, and by these presents do ratify, confirm, and grant, unto the said freeholders and inhabitants, their heirs, successors, and assigns, and to each and, every of them, their particular lots and estates in the said town, or any part thereof; and I do likewise confirm and grant unto the freeholders and inhabitants in general, their heirs, successors, and assigns, the privileges of a town; but immediately depending on this city, as being within the liberties thereof."

The limits of the town were then fixed by a line which ran from the North river, in the neighborhood of 128th street, to the East river, at a point considerably below the premises in question, opposite to what is now known as "Blackwell's Island"; and from this line the town of Harlem extended on the north to the Harlem and Hudson rivers; the patent continuing:

"It shall be the west bounds of their lands, and all the lands lying, being within the said line so drawn north and south as aforesaid, eastward to the town and Harlem river, as also the North and the East rivers, shall belong to the said town, together with all the soils, creeks, quarries, woods, meadows, pastures, marshes, waters, fishing, hunting, and fowling. and all other profits, commodities, emoluments, and hereditaments to the lands and premises within the said line belonging or in any wise appertaining, with their, and every of their, appurtenances."

This patent was confirmed by two subsequent patents,—one by Gov. Nichols in the year 1667, and one by Gov. Dongan in March.

1686. Prior to the conquest by the British, it would appear that the farm of which this marsh was a part was in possession of or claimed by one John Le Montagne; and in the year 1672 the inhabitants and freeholders of Harlem granted to John Le Montagne a piece of land, with the meadows thereto annexed, named "Montagne Point," with the meadows in the bend of Hell Gate; and it was under this grant that the heirs and grantees of Le Montagne have held and claimed title to the upland and the meadows in question, subsequent to this grant to the inhabitants and freeholders of Harlem, and in 1686, the city of New York acquired under the Dongan charter the title to the tideway or land between high and low water mark on the whole circuit of Manhattan Island. It seems quite clear that if this marsh or meadow had vested in the inhabitants and freeholders of Harlem prior to the grant to the city of New York, and had been granted by the inhabitants and freeholders of Harlem to Le Montagne, the city of New York has no title to the premises in question.

The effect of these two grants to the inhabitants and freeholders of Harlem and the city of New York was discussed by the court of appeals in Mayor, etc., v. Hart, 95 N. Y. 443. The property the title to which was in question in that case was a piece of land at the foot of 129th street and Third avenue, and included the strip of land between high and low water marks on the Harlem river. It was there held that at the time of the conquest of New York by the British the common law of England entered with them, and that under the common law the grant to the inhabitants and freeholders of Harlem ended at high-water mark along the river; that the tideway upon the river between the high and low water mark had not passed under the Harlem patent, but had passed to the city of New York under the Dongan charter. The question settled by that decision was as to the strip of land along the river between high and low water mark. The question here presented is as to a large tract of meadow or marsh land extending along the river for upwards of a half mile, and of nearly the same depth, distinctively a marsh upon which grew grass and sedge. It would seem that such a piece of land came directly within the description contained in the Harlem patent. To the village of Harlem, or to its inhabitants and freeholders, is granted all land to the north and east of a line drawn across the Manhattan Island, together with all the soils, creeks, quarries, woods, meadows, pastures, marshes, waters, fishing, hunting, and fowling. Within this description would certainly be included these marshes. No more apt terms could be devised to describe this particular piece of marsh land along the river, intersected by creeks upon which salt hay and grass grew, valuable to the farmer as appurtenant to his farm. It is well settled that surrounding circumstances may be considered to reach the true meaning of the grant (Knapp v. Warner, 57 N. Y. 668), and the construction given to it by the parties. This question was also considered by Judge Finch in Mayor, etc., v. Hart, supra, who said:

"But the interesting and careful researches of the counsel for the city demonstrate that Harlem was established as a village within the general

limits of the city itself, which was meant to embrace the whole island, and that the new village or settlement was formed for the 'promotion of agriculture,' 'the security of the island and the cattle pasturing thereon,' and 'the recreation and amusement of the city of New Amsterdam.' The city was to be the seaport, and for this purpose its water front was to girdle the island, while the village was meant for a rustic hamlet, whose inhabitants should own cattle, rather than ships."

And the court held that there was here no adequate reason for straying from the general rule in construing the Harlem patents in relation to this strip between high and low water mark.

The limit of the property granted by the Harlem patent to the inhabitants and freeholders of Harlem was also considered by the court of appeals in Sage v. City of New York, 154 N. Y. 61, 47 N. E. 1096, 38 L. R. A. 606, 61 Am. St. Rep. 592; Jarvis v. Lynch, 157 N. Y. 445, 52 N. E. 657; and in Re City of New York, 168 N. Y. 134, 61 N. E. 758. The result of these cases, applying the rule established in Mayor, etc., v. Hart, supra, has been to confirm the title of the city of New York to the tideway between high and low water mark upon the Harlem river, extending the property granted to the inhabitants and freeholders of Harlem to the high-water mark upon the river. In Sage v. City of New York, supra, attention is called to the confirmation by the first constitution of this state "of grants of land within this state made by authority of the said king, or his predecessors" (see Const. 1777, §§ 35, 36); and it was held that the right of the people to improve the tideway between high and low water mark, reserved in the grant to the inhabitants and freeholders of Harlem, permitted the state, or its substitute, the municipal corporation of the city of New York, to improve the tideway for the purpose of navigation or commerce, notwithstanding that it thereby inflicted injury upon the riparian rights which attached to the property abutting on the river, which had been acquired under the grant to the inhabitants and freeholders of Harlem. These cases all refer to the tideway, strictly speaking, namely, to that strip of land abutting upon the river which was included between the ordinary high and low water mark. A different question is here presented. The land in dispute is a marsh, within the express terms of the grant to the inhabitants and freeholders of Harlem, is useful and has always been used for the purpose for which the village of Harlem was established,—to secure food and bedding for cattle, and in general aid of agriculture,—a most important consideration for "a rustic hamlet, whose inhabitants should own cattle, rather than ships." These marshes could have been of no possible use for ships or navigation. They were most important for an agricultural community, as a part of farming lands. That these marshes would come within the express terms of this grant to the inhabitants and freeholders of Harlem seems to me clear from the terms of the grant, considering the nature and location of the property; and this conclusion is much strengthened by the act of the parties to the grant in assuming to convey these marshes, and the further fact that during all this period, until the present day, the city of New York has not claimed any title or interest in the premises in question; it being reserved

for this defendant, obtaining possession of this property under a forged deed, to claim that the grantees of these original inhabitants and freeholders of Harlem, who have claimed and exercised for over 200 years the right of ownership of this property, were not its owners, but that the title had vested in the city of New York.

The rule of construction of grants which limits a grant bounded upon the sea or an arm of the sea to the high-water line is founded upon the treatise "De Juris Maris," by Sir Matthew Hale, which was published in 1787 in a collection of tracts by Francis Hargrave. Chapter 6 of that treatise relates to the ownership of property which a subject may have in the seashore, and in it there are recognized three sorts of tides. There are: First. High spring tides, which are the fluxes of the sea, and those tides which happen at the two equinoxes: but the line embraced within these tides does not belong to the crown—

"For such spring tides many times overflow ancient meadows and salt marshes, which yet unquestionably belong to the subject." "2nd. The spring tides which happen twice every month at full and change of the moon; and the shoar in question is by some opinion not denominated by these tides neither, but the lands overflowed by these fluxes ordinarily belong to the subject prima facie, unless the king hath a prescription to the contrary. And the reason seems to be, because for the most part the lands covered with these fluxes are dry and maniorable; for at other tides the sea doth not cover them." "3d. Ordinary tides or nepe tides, which happen between the full and change of the moon; and this is that which is properly littus maris, sometimes called marettum, sometimes warettum. And touching this kind of shoar, viz., that which is covered by the ordinary flux of the sea, is the business of our present inquiry."

As to this "shoar," however, it is held that it may belong to a subject, either by grant from the crown or by prescription; and the evidences to prove this ownership are commonly these:

"Constant and useful fetching gravel and sea weed and sea sand between the high water and low water mark, and licensing others so to do; enclosing and embanking against the sea and enjoyment of what is so inned; enjoyment of wrecks happening upon the sand; presentment and punishment of purprestures there in the court of a manor; and such like. And as it may be parcell of a manor, so it may be parcell of a vil or parish; and the evidence for that will be usual perambulations, common reputation, known metes and divisions, and the like."

We have in this case a grant to the inhabitants and freeholders of Harlem, which within its terms would include these marshes. We have a contemporaneous construction of the grant, by which the grantees conveyed the marshes as a part of a farm which included the upland adjacent, and we have the continued occupation and use of these marshes by the owners of the upland for many years, with the fact that the city of New York, the subsequent grantee from the crown of all the land not included within the Harlem patent, makes no claim to the property, and has made none for over 200 years from the date of the patent, and during all that period recognized the title of the grantees; taxing and assessing the land, and refusing to make claim thereto. I think that this contemporaneous construction by the parties to these grants to the village of Harlem and by the city of New York, coming down to the present time, and the use of the property to which attention

has been called, would resolve any doubt, if doubt there be, in favor of including these marshes within the grant to the inhabitants and freeholders of Harlem, so that they never passed under the subsequent charters to the city of New York.

The only question remaining is as to whether the plaintiffs have proved title under this grant to the inhabitants and freeholders of Harlem. This deed from the inhabitants and freeholders of Harlem to John Le Montagne was introduced in evidence, and is printed in full in Pirsson's Dutch Grants (page 30). This deed conveys the meadows in the bend of Hell Gate. The history of the Le Montagne title is then set out in the same volume at page 85, and it appears that this Le Montagne farm eventually passed to Johannis Benson by deed dated in 1706; by a subsequent conveyance dated January 28, 1742, it passed to Benjamin Benson; and subsequently, by deed introduced in evidence, dated May 2, 1792, Benjamin Benson conveyed these premises to Sampson Benson. By the description in this last-named deed, the land conveyed runs easterly along William Waldron's land to the drowned meadows or marsh; then northerly and easterly along said meadows or marsh till it comes to the mouth of Mill creek; thence westerly along said Mill creek or pond to the place of beginning,—including all the estate of the said Benjamin Benson and Susannah, his wife, to the southward of said Mill creek or pond. As we have seen, these meadows or marshes were a part of, and belonged to, this upland there conveyed, and were to the southward of Mill creek or pond; and this clause including the estate of Benjamin Benson and Susannah, his wife, to the southward to the said Mill creek, would include this marsh in question. This description was, I think, sufficient to include the marshes and meadows to the south of the property conveyed, and which had been included within the property conveyed to Benjamin Benson by the prior deed. Sampson Benson died leaving one child, Margaret, who subsequently became the wife of Andrew McGown, as his only heir at law. Margaret McGown conveyed these premises to Edward Sanford by two deeds dated January 30, 1835,—the upland by the following description: "All that certain tract, piece, or parcel of land, with the buildings thereon erected, situate, lying, and being at Harlaem, in the Twelfth ward of the city of New York," bounded "westerly by the Third avenue, easterly by the Harlaem river, northerly on one side by the Harlaem creek, and southerly on the other side by the marsh and lowland this day conveyed by the party hereto of the first part to the said party hereto of the second part;" and the marsh as "all that certain piece or parcel of marsh or low land situate, lying, and being at Harlem, in the Twelfth ward of the city of New York, and bounded as follows; that is to say: Westerly by the Third avenue, easterly by the Harlem river, southerly by a line drawn through the centre of 103rd street, as the same is laid down on the commissioners' map of the city of New York, and northerly by the upland this day conveyed by the party hereto of the first part to the said party hereto of the second part"; and by subsequent conveyances the title that Margaret McGown here conveyed has become vested in

the plaintiffs. If we are right, therefore, in our construction of the Harlem patent, and that these meadows and marshes passed under it to the inhabitants and freeholders of Harlem, it would seem to follow that the plaintiff has shown a good title to the premises in question.

There is no question presented upon this appeal, except as to the plaintiffs' title; and it follows that the judgment and orders appealed from should be affirmed, with costs. All concur.