SAMUEL STEWART et al., Appellants, *v.* HARRY TURNEY et al., Respondents.

Water and watercourses — title to land bordering on Cayuga lake runs to the water thereof at low-water mark — owner of such land, or his lessee, may maintain action for trespass against persons who passed over the land above ordinary low-water mark without their consent.

1. While it is the general rule that a grantee from the state, of land bordering on a stream or lake will take to the center of the stream or lake, in the case of large navigable waters, like Cayuga lake, it seems a grant from the state of land bordering on the lake would not carry to the center thereof but to some point on the shore.

2. Where the state granted, by patent, land bordering on Lake Cayuga, described as "Farm Lot 86, Late Cayuga Reservation, which lies on the east side of Cayuga Lake," another map referred to shows

# 118     STEWART v. TURNEY.

the lot running to the water; this carries the line to ordinary low-water mark. Therefore, the plaintiffs, lessees of the present owner, can maintain an action of trespass against defendants who passed over the land above ordinary low-water mark without their consent.

*Stewart* v. *Turney,* 203 App. Div. 486, reversed.

(Argued June 8, 1923; decided November 27, 1923.)

APPEAL from a judgment, entered December 2, 1922, upon an order of the Appellate Division of the Supreme Court in the fourth judicial department reversing a judgment in favor of plaintiffs, entered upon a decision of the court on trial at Special Term and directing a dismissal of the complaint.

*Frank S. Coburn* and *Harry Gleason* for appellants. It appearing by the conveyance to plaintiffs' grantors that the west line of the property in dispute extended along the shore of the lake, plaintiffs' title passed to low-water mark, and regardless of riparian rights the judgment of the trial court was proper. (*Ledyard* v. *Ten Eyck,* 36 Barb. 125; *Canal Commissioner* v. *People,* 5 Wend. 446; *C. & St. L. R. R. Co.* v. *Valentine,* 19 Barb. 491; *Child* v. *Starr,* 4 Hill, 369; *City of Geneva* v. *Henson,* 195 N. Y. 463; *Halsey* v. *McCormick,* 13 N. Y. 296; *Yates* v. *Van De Bogart,* 56 N. Y. 531; *People* v. *Kyser,* 138 N. Y. Supp. 801; *Wheeler* v. *Spinola,* 54 N. Y. 385.)

*Nelson L. Drummond* for Harry Turney et al., respondents. The title to the lands in question in the case now before the court is vested in the people of the state of New York from high-water mark to high-water mark; that is, from the line of upland vegetation on the one side to the line of upland vegetation on the other, and inclusive of the shore. (*State* v. *Thompson,* 134 Iowa, 25; *State* v. *Jones,* 143 Iowa, 398; *Baker* v. *Johnson,* 178 App. Div. 230; *W. V. P. & P. Co.* v. *Peck,* 189 App. Div. 286.) As a matter of fact and of law, the title to the bed of Cayuga lake inclusive of the shore is vested in the people of the state of New York. (*Geneva* v. *Henson,* 140 App. Div.

49; 195 N. Y. 446; 202 N. Y. 545; *Chism* v. *Smith,* 174 App. Div. 332; *Champlain R. R. Co.* v. *Valentine,* 19 Barb. 484; *Canal Commissioners* v. *People,* 5 Wend. 447; *McBurney* v. *Young,* 67 Vt. 574; *Austin* v. *Rutland R. R. Co.,* 45 Vt. 215; *Fletcher* v. *Phelps,* 28 Vt. 257; *People* v. *Kyser,* 78 Misc. Rep. 68.) It is the contention of the state, asserted and proceeded on by the departments thereof, that on the navigable bodies of water in the state the title of the state extends from ordinary high-water mark to ordinary high-water mark; that is, from the line of upland vegetation on the one side to the line of upland vegetation on the other, and that the line of upland vegetation is to be taken as it was at the time of the patent granted by the state. (*State* v. *Korrer,* 1916C, L. R. A. 139; *Tiffany* v. *Oyster Bay,* 234 N. Y. 20; *Hinkley* v. *State of New York,* 202 App. Div. 570; 234 N. Y. 309; *People* v. *Chateaugay O. & I. Co.,* 198 App. Div. 173.)

*George B. Becker* for Robert Bausch, respondent. The title to the bed of Cayuga lake is in the state of New York. (*City of Geneva* v. *Henson,* 202 N. Y. 545; *Sweet* v. *City of Syracuse,* 129 N. Y. 316; *Chism* v. *Smith,* 174 App. Div. 332; *Canal Commissioners* v. *People,* 5 Wend. 447; *People* v. *Kyser,* 78 Misc. Rep. 68; *Langdon* v. *Mayor,* 93 N. Y. 128; *Knickerbocker Ice Co.* v. *Schultz,* 116 N. Y. 382; *Sage* v. *Mayor,* 154 N. Y. 61; *Seneca Nation* v. *Christie,* 126 N. Y. 122.) The bed of Cayuga lake extends from high-water mark to high-water mark. (*People ex rel. Burnham* v. *Jones,* 112 N. Y. 597; *Smith* v. *City of Rochester,* 92 N. Y. 463; *Fulton Light, Heat & Power Co.* v. *State of New York,* 200 N. Y. 400; *West Virginia Pulp & Paper Co.* v. *Peck,* 189 App. Div. 286.) In the case of our inland seas or large navigable bodies of water, the title of the riparian owners of land, adjacent to such bodies of water, extends only to high-water mark. (*Canal Commissioners* v. *People,* 5 Wend. 547; *People* v. *Canal Appraisers,* 33 N. Y. 461; *Canal Appraisers* v. *People,*

17 Wend. 597; *Wheeler* v. *Spinola*, 54 N. Y. 377.) The title to lands between the high- and low-water mark, bordering on the large navigable lakes in this state, is undoubtedly in the state of New York. (*People ex rel. Burnham* v. *Jones*, 112 N. Y. 597; *Ledyard* v. *Ten Eyck*, 36 Barb. 102; *Kingman* v. *Sparrow*, 12 Barb. 201; *St. Louis, etc., R. R. Co.* v. *Ramsey*, 53 Ark. 314; *Carpenter* v. *Hennepin County*, 56 Minn. 513; *Ephrim Creek Coal Co.* v. *Bregg*, 75 W. Va. 70; *Wheeler* v. *Spinola*, 54 N. Y. 377.)

*Carl Sherman, Attorney-General* (*Irving I. Goldsmith* of counsel), for State of New York.

ANDREWS, J. Cayuga lake is thirty-eight miles long and from one to three miles wide. Lying east of the Massachusetts pre-emption line it is no part of the state's boundary. Not far away are ten other lakes of considerable size. Some — Canaderaga, Cazenovia, Onondaga, Otisco and Cross — are but a few miles long and from one-half to two miles wide. Others — Otsego, Owasco and Skaneateles — are larger. One — Oneida — has more water surface than Cayuga. Further east are similar lakes — Lake George, Saratoga lake, Cranberry, Saranac, Tupper, Schroon and others.

All these lakes are alike in some respects. At irregular intervals the water level is raised by spring freshets or heavy rains. Again in time of drought it is lower. So along each is a strip of land sometimes free of water — sometimes covered. On each also are points or beaches of gravel or sand washed up by the waves, lying between the line of inland vegetation and the water and covered, if at all, only in times of extreme floods. All are in fact navigable, although in none does the tide ebb and flow. In a few instances title to the land about them is derived from colonial grants. Usually, however, its source is the state. Often, perhaps in most instances, the description of the land granted is of a lot represented on a certain

map and a reference to the map shows the lot running down to the water.

Such was the grant under which the plaintiffs claim. It was of " Farm Lot 86, Late Cayuga Reservation which lies on the east side of Cayuga lake." The map of the reservation referred to shows this lot abutting upon the lake. The photographs in evidence give us an idea of the lake shore at this point. Stretching eastward from the water is a beach of gravel and boulders for some thirty feet. It terminates in a rise covered with vegetation. Beyond is said to be a marsh. The gravel beach for much of the year is free from water. When the lake is high, however, it is overflowed. So in extreme high water is the rise to the east and small boats may pass over it directly to the marsh.

Upon this beach the defendants entered and did the acts which are claimed to be trespasses. Such they were in fact if title to the beach is vested in plaintiffs' lessor. This is the question for our decision for we do not think under the findings as made that any purely riparian rights which the plaintiffs may have possessed were interfered with. If, however, their lessor owned the fee to the beach in question it is not disputed but that an injunction should issue.

Our answer to this question depends primarily upon the meaning and effect of the grant from the state. In deeds from an individual owning to the center of a highway or a non-tidal stream or a lake or pond of land said to be bounded by such highway, stream or lake or simply of a tract with reference to a map showing the tract to be so bounded, the grantee takes title to the center of the highway or to the thread of the stream or lake. A presumption founded originally upon the assumed intent of the parties it has now become a rule of property. If the grantor desires to retain his title to the land in the highway or underneath the water the presumption must be negatived by express words or by such a description as clearly excludes it from

**122**              STEWART *v.* TURNEY.

the land conveyed. And, at least, ordinarily the same rule applies to grants from the state except as to the Hudson and Mohawk rivers which, because of historical reasons, are governed by special rules. " What then was the extent of the premises thus granted by the state? In the terms of sale, and in the terms employed in the patent, a phraseology has been adopted, which, as between private individuals, would convey an interest to the middle of the river. And is the doctrine to be tolerated which shall assign one construction to a contract between private citizens, and a different one between an individual and the government? Would not the adoption of such a rule of construction operate as a fraud upon a purchaser who should pay an enhanced price for land adjacent to a stream of water upon the faith of a contract, which, as between private individuals, would have given him valuable hydraulic privileges? It seems to me that but one answer can be given to these questions." (*Varick* v. *Smith,* 9 Paige, 547, 552; *Ex parte Jennings,* 6 Cowen, 518; *Smith* v. *City of Rochester,* 92 N. Y. 463; *Fulton L., H. & P. Co.* v. *State of New York,* 200 N. Y. 400; *City of Oswego* v. *Oswego Canal Co.,* 6 N. Y. 257; *Syracuse Solar Salt Co.* v. *Rome, W. & O. R. R. Co.,* 43 App. Div. 203; affd., 168 N. Y. 650; *Hardin* v. *Jordan,* 140 U. S. 371; *Lord* v. *Commissioners of Sydney,* 12 Moore P. C. 473; *Browne* v. *Kennedy,* 5 H. & J. [Md.] 195; *Berry* v. *Snyder,* 66 Ky. [3 Bush] 266; *Lamprey* v. *State,* 52 Minn. 181; *Chandos* v. *Mack,* 10 L. R. A. 207.)

While admitting, however, the general rule, it is said that it should be limited in the case of a lake the size of Cayuga. Based as it is on presumption as to what grantor and grantee intended, this presumption may be rebutted, and the results flowing from its application in the case of this lake would be so remarkable that we should hold the physical situation to be such as to show no such intention could have been present. It cannot, it is argued, be supposed that the grantee of one hundred

square feet upon the shore has attached to his property a strip of land under water two miles in length.

Yet there is much authority to the contrary. (*Bristow* v. *Cormican*, L. R. 3 A. C. 641, 666; *Johnston* v. *O'Neill*, L. R. 1911, A. C. 552, 577.) These cases deal with Lough Neagh, eighteen miles long and eleven wide. (*Johnston* v. *Bloomfield*, Irish Rep. 8 C. L. 68.) Lough Erne is slightly smaller. (*Cobb* v. *Davenport*, 32 N. J. Law, 369; *Rice* v. *Ruddiman*, 10 Mich. 125.) Muskegon lake is six miles by two and a half.

In this state the question has never been determined. In *City of Geneva* v. *Henson* (195 N. Y. 447; 202 N. Y. 545) we construed the meaning of deeds between owners describing the boundary as the shore of the lake. In *Sweet* v. *City of Syracuse* (129 N. Y. 316) we noticed the contention that the fee of the land beneath Skaneateles lake was in the state. In *Smith* v. *City of Rochester* (92 N. Y. 463) Judge RUGER said " in passing " that the doctrine that the bed of fresh water streams where the tide does not ebb and flow belongs in common right to the owners of the soil adjacent is inapplicable to the " vast " fresh water lakes and streams of this country. Just what he meant by " vast " is not stated. Certainly not Hemlock lake, seven miles long and half a mile wide, for there we held the general rule applied. In *Canal Commissioners* v. *People* (5 Wend. 423) the question was as to the meaning of a grant from the state bounded by the Mohawk river. A statement of the chancellor that the common-law rule as to such grants does not embrace our large fresh water lakes or inland seas was purely dictum. In *Ledyard* v. *Ten Eyck* (36 Barb. 102) the court held that the title of the abutting owners extended to the center of Cazenovia lake.

Were it necessary we would hold, however, that with regard to a grant of land on Cayuga lake an exception should be made to the common-law rule. We are aware of the statement of Judge BRADLEY in *Hardin*

v. *Jordan* (140 U. S. 371, 397) that the Supreme Court does not think the argument *ab inconvenienti* is sufficient to justify an abandonment of this rule. That to do so is too much like judicial legislation. This is true where the law is clear. Where it is unsettled the result of a proposed rule may turn the scale. So with reference to such a body of water the ordinary rule is so impractical that we give weight to that consideration. Added also to the doubts that have been expressed by great judges is the fact that the claim has been often asserted by the state to ownership of the land under the water of these large lakes. A number of such grants have been made on Lake George, on Cayuga lake, on the east shore of Seneca lake and even on Otsego lake. And one of the commonest modes of rebutting a presumption as to title is continued acts of ownership by the grantor. Further than that no claim to the contrary seems to be made by the appellants in the case before us.

We will assume, therefore, that the grant of lot 86 did not carry title to the center of Cayuga lake. Even so, however, the question as to the title of the land in dispute remains unanswered. Precisely what did the state grant and precisely what did it reserve? Where is the precise line of demarkation between the land retained and the land granted?

In passing upon this question we must realize that there is no analogy between this lake where the water changes its level at uncertain and irregular intervals and the seacoast where daily the tide ebbs and flows; where the line of ordinary high and low tide is fairly definite. Even here the upper line is defined by " ordinary " high tides. High spring tides are not considered. Nor are extraordinary tides caused by storms. Nor are the tides which happen twice a month with the full and change of the moon. The line is governed by the neap tides (Hale De Jure Maris, chap. 6; *Baird* v. *Campbell*, 67 App. Div. 104; *Low* v. *Govett*, 3 Barn. & Ad. 863; *Teschemacher* v.

*Thompson*, 18 Cal. 11); or at least by the line of medium high water between the monthly spring and neap tides. (*Attorney-General* v. *Chambers*, 18 Jur. 779; *N. J. Zinc & Iron Co.* v. *Morris Canal Co.*, 44 N. J. Eq. 398; *U. S.* v. *Pacheco*, 69 U. S. [2 Wall.] 587.) And this is true although every spring the waters of tidal rivers may be raised by floods, exactly as is the case of inland lakes. On the lower Hudson the line of the state's ownership is not defined by the annual spring freshets rather than by ordinary high tide. It is also well to remember that under the assumption we made we are dealing with an exceptional case. · The fact that this is so, the fact that the grantee may well desire complete and unrestricted access to the water, the fact that where the shore of the sea is granted, the lower boundary probably may not be restricted to the line of ordinary low tide, but to the line at its lowest ebb (1 Farnham on Water Rights, 228) may well be considered in deciding what the state has granted.

In speaking of such boundaries on lakes, courts have frequently said that they run to high or to low-water mark. Usually exactly what is meant by these terms is not defined. Often the statement is made casually without examination because not determinative of the case under discussion. Sometimes as in California, Washington, North and South Dakota and perhaps elsewhere it rests upon a local statute or constitution. Sometimes it is held that the bed of lakes is held by the state in trust for the people and may not be granted. Therefore, a patent is given a narrow construction. Many cases in the United States Supreme Court depend upon the law of the states in which the land is situated. (*Hardin* v. *Shedd*, 190 U. S. 508.) Foreign cases are, therefore, to be cited with caution.

In fixing the boundary of such a grant as the present there are four possible choices. We may take the line of extraordinary spring floods. We find, however, no support for this position and we pass it by. We may take

the line of vegetation or erosion. We do not think this is satisfactory. No such rule prevails upon the seacoast where barren sands or rocks often lie above the reach of ordinary tides. So it is with beaches of sand or gravel on these lakes which do not support vegetation yet which are rarely or never covered with water. The support of such a rule seems to be rested largely on *Howard* v. *Ingersoll* (13 How. [U. S.] 381). In support of it are also cited *Oklahoma* v. *Texas* (260 U. S. 606); *Houghton* v. *C., D. & M. R. Co.* (47 Ia. 370); *Diana Shooting Club* v. *Husting* (156 Wis. 261) and *Matter of Lake Minnetonka* (56 Minn. 514). In *Howard* v. *Ingersoll* the court construed the meaning of language used in an instrument by which the state of Georgia ceded land from the " west bank " of the Chattahoochee river to the United States. This interpretation was not aided, the court said, by cases upon the rights of riparian proprietors holding under grants from a state having the entire ownership of a river. The case was one of two sovereignties dealing for a cession of country from one to the other with a river between them to be marked on a bank of it from which the ceded land was to commence. What under such circumstances did the word " bank " mean? At the point involved the river was about six hundred feet wide, lying between abrupt banks fifteen or twenty feet high. Much of the year the water was confined to a channel thirty yards wide, leaving exposed rocks with slues between them. Any endeavor to trace the line of cession by low water must fail. Such a term is only predicable of rivers within the ebb and flow of the tide. The word used was " bank." Rivers have banks, shores, water and a bed as all knew when the cession was made. By inspection the banks could be determined. It means those boundaries which contained the water at its highest flow. This case, therefore, seems to aid us little in deciding the meaning of the grant before us, except that possibly the distinction drawn between the " bed " of a river and its " shores," meaning by the

1923.]          Opinion, per ANDREWS, J.          [237 N. Y. 117]

latter term that part of the river uncovered at low water, may be useful if what the state of New York retains is the bed of Cayuga lake.

In *Houghton* v. *C., D. & M. R. Co.* the court, following the Iowa rule, held that an abutter upon the Mississippi took only to high-water mark and it defined this mark, not as determined by the highest point ordinarily reached by periodical rises in June and September, but by the edge of the bank — the portion of the earth which confines the river in its channel. The rises that came from storms and melting snows should be disregarded. They are temporary and uncertain. But the banks afford a certain line. They are impressed upon the earth itself by the attrition of the river current. Certainly what the river does not occupy long enough to wrest from vegetation is not river bed. All this is clearly true. A river with a defined current wears a bed which all may see. A lake does not. No more than the sea may it be said to have banks. In *Matter of Lake Minnetonka* what was said was entirely applicable to the case under consideration. Around the lake were places where the banks were steep and abrupt. Elsewhere were meadows where the land was but slightly above the ordinary water level and subject to periodical overflow. The court rejected the claim that the state might in aid of navigation raise the water so as to permanently cover these low lands. " While the property of a riparian owner," it is said, " on navigable or public waters extends to ordinary low-water mark yet it is unquestionably true that his title is not absolute except to ordinary high-water mark. As to the intervening space the title of the riparian owner is qualified or limited by the public right " of navigation and the state may prevent any use of it even by the owner of the land that would interfere with this right. The court then continues that high-water mark does not mean the limits of spring floods or freshets but only that point reached by the water for such a length of time and so

continuously as to wrest it from vegetation. This must be the principal test. In *Diana Shooting Club* v. *Husting* it was held that the public might fish or hunt upon any navigable stream below ordinary high-water mark and that mark was defined as that point on the bank up to which the presence of the water is so continuous as to leave a distinct trace either by erosion, destruction of vegetation or other easily recognized characteristics. No question of title was involved. Indeed, the court expressly declined to decide whether the public might enter below high-water mark upon a strip which by the recession of the water becomes unnavigable or is left uncovered. This was settled in the negative, however, in *Doemel* v. *Jantz* (193 N. W. Rep. [Wis.] 393), which case cites and explains the case to which we have referred. In *Oklahoma* v. *Texas* the controversy was again as to the meaning of a treaty which fixed a national boundary on the southern bank of the Red river. Here in most places there was a " cut " bank eroded by the water. This was the bank intended. Where no bank existed a level was to be taken of the height of the water when it washed the bank without overflowing.

None of these cases, therefore, aid us in the construction of the grant before us. At most some of them defined what is meant by high-water mark. A similar definition is given in decisions called to our attention in the courts of Maine, West Virginia, Arkansas, Oregon, Oklahoma and Iowa, but some of these cases do also hold that such a grant as the present takes only to high-water mark as so defined. All of them are immaterial, therefore, unless we are prepared to hold that the grant before us is limited by the high-water line. Then, indeed, they might assist us in deciding where that line should be drawn. So the substantial question remains as to what is the limit of such a grant in our state. Is it the line of ordinary spring floods or the line of low water reached in the dry season?

While this court has never definitely passed upon the question, the current of opinion is that it is low-water mark. In *Canal Commissioners* v. *People* (5 Wend. 423) appears a dictum by the chancellor that the common law does not apply to our large fresh water lakes but as to them such a grant as the present takes to low-water mark. Such was the express ruling in *Champlain & St. L. R. R. Co.* v. *Valentine* (19 Barb. 484). The same ruling was made in *Sweet* v. *City of Syracuse* (60 Hun, 28, 38). While we reversed this case we made no criticism of this particular statement. So as to a private grant in *Child* v. *Starr* (4 Hill, 369). (See, also, *Chism* v. *Smith*, 138 App. Div. 715.) Similar statements have been made by us. (*Halsey* v. *McCormick*, 13 N. Y. 296; *Wheeler* v. *Spinola*, 54 N. Y. 377; *Yates* v. *Van DeBogert*, 56 N. Y. 526; *Gouverneur* v. *Nat. Ice Co.*, 134 N. Y. 355, approving of *Wheeler* v. *Spinola* to this extent; *City of Geneva* v. *Henson,* 195 N. Y. 447, 465.) It is true that some of these cases refer to grants between individuals, but as has been pointed out where the state conveys its unappropriated lands for a consideration its grants are to be construed as would be such deeds. It is true also that in *Sisson* v. *Cummings* (106 N. Y. 56) we expressly refrained from discussing the question and that in *People ex rel. Burnham* v. *Jones* (112 N. Y. 597) we noted the concession of both parties that the line of riparian proprietorship along Lake Ontario extends but to high-water mark, but that concession, even had we expressed approval of it, which we did not, was immaterial to any question involved in the case. In some of the cases quoted the statement as to low water may have been made without particular consideration of the question. In others it may not have been strictly necessary to the decision rendered. But even *dicta* repeated by many judges under varying circumstances, while not binding upon us, are most persuasive.

In other states we think the weight of authority is in

favor of the same rule. (*State* v. *Korrer*, 127 Minn. 60; *City of Peoria* v. *Cent. Nat. Bank*, 224 Ill. 43; *Mariner* v. *Schulte*, 13 Wis. 692; *Martin* v. *City of Evansville*, 32 Ind. 85; *State ex rel. C. E. Lighting & Power Co.* v. *Longfellow*, 169 Mo. 109; *Lincoln* v. *Davis*, 53 Mich. 375, 384; *Bates* v. *R. R.*, 12 Monthly L. Rep. [N. S.] 519; *Stover* v. *Jack*, 60 Penn. St. 339; *Brown Oil Co.* v. *Caldwell*, 35 W. Va. 95; *Martin* v. *Nance*, 40 Tenn. 649; *Denny* v. *Cotton*, 3 Tex. Civ. App. 634; *Mobile Transportation Co.* v. *City of Mobile*, 153 Ala. 409; *State* v. *Eason*, 114 N. C. 787; *Thurman* v. *Morrison*, 53 Ky. [14 B. Monroe] 367; *Whitenack* v. *Tunison*, 16 N. J. L. 77; *McBurney* v. *Young*, 67 Vt. 574; *Wood* v. *Kelley*, 30 Me. 47; *Handly's Lessee* v. *Anthony*, 5 Wheat. 374; *Paine* v. *Woods*, 108 Mass. 160.) The Massachusetts cases are sometimes said to be unimportant because where land is bounded by the sea that state treats low water as the boundary of title. They do not rest, however, upon any such analogy. In support of the rule announced in the case cited the opinion refers to the dictum of the chancellor in 5 Wendell to the 30th of Maine and to the 28th of Vermont.

In view, therefore, of these decisions, in view of the fair presumption that it was the intention to give the grantee the benefit of the water wherever it may be, in view of the fact that under the assumption we have made we find an exception to our general rule which so far as possible should be minimized, we hold that under the grant from the state the grantee took to low-water mark on Lake Cayuga. Whether in high water the public has not the right of navigation wherever a boat may float we do not decide. Nor do we decide whether " low-water mark " means that mark to which the water may sink in extraordinary seasons, or simply at its ordinary and usual low level. Here such a decision is not necessary.

The grantee from the state having acquired title to the line of low water on Cayuga lake this passed to one Gawger who in 1872 conveyed it by a description running

west to Cayuga lake and then " along the east shore " of the lake. This would carry the line to low-water mark in case the grantor has title to that line. (*Child v. Starr*, 4 Hill, 369; *Gouverneur v. Nat. Ice Co.*, 134 N. Y. 355; *Van Winkle v. Van Winkle*, 184 N. Y. 193.) Therefore, there passed to plaintiffs' lessor whatever title was acquired by the original grantee.

If this be so, concededly the defendants committed repeated trespasses upon the property held by the plaintiffs. What they did was done above ordinary low-water mark. The result, therefore, reached by the trial court was right.

The judgment of the Appellate Division must be reversed and that of the Trial Term affirmed, with costs in this court and in the Appellate Division.

HISCOCK, Ch. J., POUND and McLAUGHLIN, JJ., concur; HOGAN, CARDOZO and CRANE, JJ., dissent.

Judgment accordingly.