GEORGE M. WOOD, Plaintiff, *v.* HARRIET C. MAITLAND and THE PEOPLE OF THE STATE OF NEW YORK, Defendants.

Supreme Court, Jefferson County, November 28, 1938.

*Phelps, Hudson & Wise*, for the plaintiff.

*Kinkley & Dunk*, for the defendant Harriet C. Maitland.

*John J. Bennett, Jr., Attorney-General [Warren H. Gilman, Assistant Attorney-General*, of counsel], for the defendant the People of the State of New York.

SMITH (E. N.), J. The plaintiff is the owner of three farms located in the town of Ellisburg, Jefferson county, N. Y., each having its westerly frontage upon Lake Ontario; the total frontage on the lake of these three farms is about two miles; these farms are known in the record as the Eldorado farm, the Alverson farm and the Boomer farm; the Eldorado farm is the most northerly; the Alverson farm is the central farm and adjoins the Eldorado farm; the Boomer farm is the most southerly farm and adjoins the Alverson farm; the character of the upland on the lake frontage of the Eldorado farm is a limerock ledge; at the boundary line between the Eldorado farm and the Alverson farm the character of the lake frontage abruptly changes from a limerock ledge into sand; there is nothing but stone north and nothing but sand south of the boundary line between the Eldorado and Alverson farms on the lake frontage; from the southerly boundary of the Eldorado farm (being the northerly boundary of the Alverson farm) southerly along the frontage on the lake of the Alverson farm and the Booner farm there is a sand beach; behind the sand beach easterly are so-called sand dunes, and on these sand dunes there was a growth of trees of considerable size — pine, soft maple and birch; easterly of the sand dunes and trees on the Alverson farm is a so-called pond known as Black pond, and also a marsh, which likewise is behind and to the easterly of the sand dunes on the Boomer farm.

In the complaint as originally drawn the parties defendant were Daniel Maitland and the State of New York. There is no dispute as to the title of the plaintiff to the lands described in the complaint, excepting as hereinafter noted. The complaint alleges that the People of the State of New York unjustly claim or might unjustly claim an estate or interest in such part of said lands as consists of marsh and ponds, as follows: ". that said pond and marsh lands are not and never have been enclosed by uplands or otherwise and are a part of Lake Ontario, and that the plaintiff's title extends only to the shores of the pond and the boundary of the marsh

aforesaid, and that the plaintiff is not and never has been the owner of said pond or marsh, but that title thereto is in the State of New York; that the People of the State of New York are made parties defendant herein for no other purpose than to determine what interest, if any, the said People of the State of New York have in and to the lands " described in the complaint, and particularly to said pond and marsh lands.

As to the defendant Daniel Maitland, the complaint alleges that he unjustly claims or might unjustly claim an estate or interest or easement in said property or such part thereof as consists of marsh and pond, the precise nature or extent of which is unknown to the plaintiff, but which, so far as plaintiff has any knowledge, is as follows: the perpetual right and easement to pass in, over and upon plaintiff's said lands, and more particularly said marsh and pond, for the purpose of setting traps thereon, hunting, trapping and fishing, and to remove from said lands, particularly said marsh and pond, the vegetable growth thereon, and also to take and remove such game, fish and fur-bearing animals as he might capture, kill or ensnare.

The defendant Daniel Maitland admits the claim of the People of the State of New York as alleged in the complaint, and admits that he claims the right to pass in, over and upon said marsh or pond for the purpose of setting traps thereon, hunting, trapping and fishing, and to remove from said lands, particularly said marsh and pond, the vegetable growth thereon or therein, and also to take and remove such game, fish and fur-bearing animals as he might capture, kill or ensnare thereon. He also admits that the People of the State of New York claim " that said marsh land is not and never has been enclosed by uplands or otherwise and is a part of Lake Ontario, and that plaintiff's title extends only to the boundary of the marsh aforesaid, and that the plaintiff is not and never has been the owner of said marsh, but that the title thereto is in the State of New York."

The defendant the People of the State of New York, after a general denial of the substantial allegations of the complaint, allege that ever since the organization of the government of the State, the State (meaning, I assume, the People of the State of New York) " have been seized and possessed of all the lands under navigable lakes and waters and the lands between the high and low water mark of said waters and between the original shore lines thereof, within jurisdiction of the State of New York," and " that the said original sovereign title of these defendants in and to such part of the land described in plaintiff's complaint as lies between the original shore lines of Lake Ontario or the arms thereof and the

boundary line between the State of New York and Canada has never been granted by the said defendants or by any legislative or administrative body or officer in behalf of said defendants and has never been divested against said defendants; and that said original sovereign title is still held by said defendants."

In October, 1937, Daniel Maitland was drowned, leaving him surviving his widow, the defendant Harriet C. Maitland, who by stipulation was substituted as a party defendant herein.

The lands of the so-called Eldorado farm contain no marsh land, nor any pond; so they are in no wise affected by any claim of the defendant Maitland. All of these lands are a part of what is known as the Macomb Purchase.

On January 10, 1792, the People of the State of New York issued letters patent to one Alexander Macomb; these letters patent were approved by the Commissioners of the Land Office January 10, 1792, and recorded in the office of the Secretary of State or of the Commissioners of the Land Office in Albany in book of Patents No. 23, at page 160, and in the office of the county clerk of Jefferson county on March 1, 1883, in book 235 of Deeds at page 3. The patent conveyed about 1,920,000 acres of land, described as follows: " Beginning at the most Wly corner of the tract of land commonly called Totten and Crossfields purchase, and running thence, along the same S. 30° E. about 21 miles to the most Wly corner of Township No. 5 of said purchase, then Wly with a direct line to the N.W. corner of a tract of 16,052 acres of land granted to Henry O. Othoudt, then with a direct line to the mouth of Salmon Creek where it empties into Lake Ontario to the northward of Oswego, then Nly along the said Lake and River St. Lawrence to a tract of land granted to Peter Penet, then along the same S. 10 miles, E. 10 miles, N. 10 miles and W. 10 miles to the said River St. Lawrence, thence down along the said river till a course S. 54° E. will strike the place of beginning, and then S. 54° E. about 53 miles to the said place of beginning, estimated to contain 1,920,000 acres." There are certain exceptions and reservations in the patent which are immaterial here. Generally, the frontage on Lake Ontario and on the St. Lawrence river was within what is now known as part of Oswego, all of Jefferson and a part of Franklin counties.

The determination of the basic issue in this case hinges upon the meaning of the words of the patent contained in these words: " to the mouth of Salmon Creek where it empties into Lake Ontario to the northward of Oswego, then Nly along the said Lake," and particularly the interpretation of the words " along the said Lake." It will be noted that this patent makes no mention of the shore

of the lake, nor any mention of the margin of the lake, and that it makes no mention whatsoever to high- or low-water mark. In the diverse mesne conveyances through which the title has come to the plaintiff to the lands involved herein, the westerly boundary on Lake Ontario is variously described as " the margin of Lake Ontario;" " to the Lake shore, thence along the Lake shore." (These expressions are found in the chain of title to the so-called Boomer farm.) In the Alverson abstract we find these expressions in one of the deeds: " thence to the shore of Lake Ontario, thence S. on said shore;" " thence Wly to the shore of Lake Ontario: thence Nly along said Lake," and " through said land to Lake Ontario." These expressions or words found in some of the descriptions in the abstracts, as I view it, whether judged from the standpoint of interpretation of the grants themselves or from the meaning of the words as determined in the decisions of the courts, can have no effect upon the interpretation of the language above quoted from the Macomb Patent, or upon the title to the lands herein involved; there has been no reservation anywhere in the chains of title of any land between Lake Ontario and the uplands. It would lead to hopeless confusion, in the absence of a particular purpose manifested in the grant to reserve such lands, to hold that lands out of the Macomb Purchase bordering upon Lake Ontario did not carry to the boundary line as fixed in the Macomb Purchase.

Lake Ontario is the most easterly of the Great Lakes; the St. Lawrence river is the outlet of the whole watershed of the Great Lakes, excepting as there may have been diversion of some of the waters of Lake Michigan through the drainage canal at Chicago into the Illinois river. Lake Ontario is navigable, carrying a large amount of shipping; into it empty rivers and streams; there are bays and ponds and lagoons, many of which are navigable; its waters are so-called inland waters, non-tidal waters, fresh waters; its greatest length is 190 miles, its greatest breadth fifty-five miles; its area is 5,400 square miles; along the northwesterly side of the State of New York it forms a part of the boundary between the United States and Canada; the International boundary line is established in the lake; it is, therefore, international in its character.

A lake is variously defined in the dictionaries. In Webster's New International Dictionary it is defined as "A considerable body of standing water in a depression of the land; also an expanded part of a river. When a body of standing water is so shallow that aquatic plants grow in most of it it is usually called a pond; when the pond is mostly filled with vegetation it becomes a marsh." The Century Dictionary defines it as "A body of water of considerable size surrounded by land; hence some smaller body of water, as

an artificial pond, a widened portion of a river, or a lagoon." The Standard Dictionary defines it as "An inland body of water or naturally enclosed basin serving to drain the surrounding country, generally of considerable size and connected with the sea by a stream formed from its overflow."

Although Lake Ontario is non-tidal in character, its levels vary from month to month at the points where they are taken. These monthly levels have been kept by the government of the United States since prior to the year 1860, and are available to the public. I have before me a chart of these levels, showing monthly mesne water levels of the Great Lakes from 1860 down to date; these levels vary within each year from one to three feet; from January, 1860, to March, 1938, the highest level of Lake Ontario noted upon this chart was in the year 1870, when it reached a height of 249 feet above mesne sea level; the lowest level of Lake Ontario noted upon the chart was in November, 1934, when it was 242.7 feet; an extreme of the variations between January, 1860, and March, 1938, of 6.3 feet; in the last decade the highest level of Lake Ontario was reached in June, 1929, when it reached 248.5 above mesne sea level. There is no regularity in level variation from high to low in terms of periods of years, although there is a popular but erroneous impression that the periods between extreme high and extreme low levels are of seven years' duration.

It is unnecessary here to go into the causes of these wide variations, but the main cause of course is the variations in the run-off from the whole Great Lakes basin. There are other causes, due to deepening of channels of the rivers connecting the lakes of the Great Lakes for navigation purposes, and due to canals — particularly the Welland Canal — and, possibly, to erosion at Niagara Falls. Whatever changes take place in the watershed or in the channels have their influence to a greater or less degree upon the levels of Lake Ontario. The artificial causes have a permanent influence, and these artificial changes, made for purposes of navigation, are not yet completed. The construction of dams on the lower St. Lawrence river and the deepening of the channel of the St. Lawrence river to the end that the whole Great Lakes region, including the St. Lawrence river, may be opened for large ocean-going ships, might and probably will have a definite influence upon the level of the waters of Lake Ontario. No studies have been made in this case for the purpose of reaching a determination, if such determination is possible, of the mesne level of Lake Ontario. I deem it unwise, therefore, in the consideration of the problem here involved, to take into consideration these variations in levels from month to month, from year to year and from decade to decade;

that problem must be left to the future. We will here interpret the language of the Macomb Patent to be as used at the time the lands were patented to Alexander Macomb by the State of New York. At the present time it would be unwise and lead to hopeless confusion to do otherwise.

While we are not here dealing with the ocean or the arms thereof, tidal waters, the course of the common law of England with respect to the general subject may help to aid us at least in understanding terms:

"The sea shore may be defined as that portion of the land adjacent to the sea which is alternately covered and left dry by the ordinary flux and reflux of the tides. Although, in common parlance, the word shore has often a more extensive meaning — taking in all that extensive belt of waste ground or strand, shingles, and rock liable to the action of every kind of tide — yet it is now finally settled, that in legal intendment no more of that unclaimed tract is sea shore than that portion which lies between high and low water mark at ordinary tides. This point has been finally settled by the case of *Attorney-General* v. *Chambers* (De Gex, M. & G., 206), in which the Lord Chancellor CRANWORTH, * * * held that the sea shore landwards is, in the absence of particular usage, *prima facie* limited by the line of the medium high tide between the spring tides and the neap tides; or, in other words, that part of the shore which for four days in every week, or for the most part of the year, is reached and covered by the tides. *As this line will vary as the sea recedes from or encroaches on the land, so the boundaries of the shore will vary with the recession or encroachments of the sea.* Land above this line, though overflowed by high spring and extraordinary tides, is not shore, but is presumed to be land the property of adjoining owners." (Coulson & Forbes on The Law of Waters [3d ed.], p. 21.)

At page 23: "The property in the soil of the shore of the sea, of estuaries and arms of the sea, and of navigable rivers between high and low water mark, is *prima facie* vested of common right in the Crown; but it may belong to a subject by ancient grant or charter from the Crown, or by prescription. This ownership of the Crown is for the benefit of the subject, and cannot be used in any way so as to derogate from or interfere with the public rights of navigation and fishery. The *prima facie* right of the Crown to the soil of the bed, as distinguished from the shore of estuaries and arms of the sea within the body of a county would appear to extend to the whole area affected by the tides and not to depend, as in the case of tidal rivers, on the question of navigability. This question has never been actually decided in this country; but it seems

manifestly absurd to suppose that whereas the shores of a tidal creek between high and low water mark *prima facie* belong undoubtedly to the Crown, the soil of the bed should belong to any other person."

In the case of *Bristow* v. *Cormican* ([L. R.] 3 A. C. 641; see, also, *O'Neil* v. *Johnston*, 1 Ir. R. [1908] 358) it was held by the House of Lords that the Crown had no *de jure* right to the soil or fisheries of inland non-tidal lakes. In this case Lord BLACKBURN stated the law to be (p. 666): " The property in the soil of the sea and of estuaries and of rivers in which the tide ebbs and flows is *prima facie* of common right vested in the Crown; but the property of dry land is not of common right in the Crown. It is clearly and uniformly laid down in our books, that where the soil is covered with the water forming a river in which the tide does not flow, the soil does of common right belong to the owners of the adjoining land; and there is no case or book of authority to shew that the Crown is of common right entitled to land covered by water, where the water is not running water forming a river, but still water forming a lake."

Under the English law, those who have acquired by user the right to navigate an inland non-tidal water have no right of property in the bed, and the right of the Crown as regards the soil on the *alveus*, and of the public to navigate, are not the same in such a river as they are in the sea or in a tidal estuary. Up to the point where the tide ebbs and flows, in a navigable river, the soil is *prima facie* in the Crown; and, above that point, whether in rivers navigable or not, the soil is presumed to belong to the riparian owners to the middle line of the stream.

It will be noted, from citations later to be made, that where navigable waters are involved we have made or are making some departure in this country from the rules of the English common law; and this is true with respect to the rulings in the State of New York.

Now for the language of the Macomb Patent: So far as the boundary of this patent is Lake Ontario, it begins at " the mouth of Salmon Creek where it empties into Lake Ontario to the northward of Oswego, then northerly along said Lake and the River St. Lawrence." It is not important here to locate the point where the mouth of Salmon creek where it empties into Lake Ontario is; it is important to locate the line " then northerly along said Lake."

Now it is evident that without water there can be no lake; it is evident also that the shore is not and cannot be the lake. To illustrate: Take a fixed point on the shore adjoining the water at its level at a particular time; if the water recedes from this point the margin of the lake changes and there is more land, sand or rock;

and likewise, if the water of the lake rises above the fixed point there is less. Where the level of the water of the lake is, bending and winding according to the contour and level of the land, there is the lake. So that in this instance the westerly boundary of the lands conveyed by the Macomb Patent, of which the lands herein involved are a part, was a variable line, varying according to the level of the water of the lake, whatever that level at a particular time might be. The lake is always there; its area increases or decreases according to the variations of the level of its water. It is clear that this view might be somewhat different from that which would follow from a making of " the lake, where it is used as a boundary line, low-water mark." In practical application, even where there has been a definition that the word " shore " carries to low-water mark, I do not feel that the intent of such rulings was that the owner of lands bordering a navigable lake would have the right to pick out the lowest low of the level of the lake as determining low-water mark as against the rights of the public. The problem in this respect is not without difficulty; but, sufficient for the decision of this case, we hold that the plaintiff's rights go to the waters of the lake, wherever they may be, varying according to the variations of the water level of the lake. We have not here involved any question of public navigability; but, in passing, we may say that where there is an arm of the lake, a pond, or a bay, which normally is navigable by the public, such rights of navigability as have been acquired by the public may be maintained and preserved against the fluctuations of water levels or against the effects of storms on the lake which sometimes wash in gravel and interfere with such navigability. Normally, such interruptions are taken care of by Nature, especially where there are streams or rivers emptying into such ponds or bays.

If the views hereinbefore stated should be of moment or come up for future consideration, there are certain decisions of the courts of this State and of the United States Supreme Court which may be of value. These are as follows: *Stewart* v. *Turney* (237 N. Y. 117); *Ransom* v. *Shaeffer* (153 Misc. 199; affd., 243 App. Div. 858); *Massachusetts* v. *New York* (271 U. S. 65).

In *Stewart* v. *Turney* the title to land bordering on Cayuga lake was involved. The opinion is exhaustive in reference to the law applicable to the inland navigable lakes within the State of New York; it does not mention lakes not wholly within the State, but is, I think, of value in the interpretation of the language of the Macomb Patent and in reference to Lake Ontario as a non-tidal lake. These lakes, and in particular Cayuga lake, have variations in level. " So along each is a strip of land sometimes free of water

— sometimes covered. On each also are points or beaches of gravel or sand washed up by the waves, lying between the line of inland vegetation and the water and covered, if at all, only in times of extreme floods. All are in fact navigable, although in none does the tide ebb and flow." The titles, as here, usually came from the State, and in the instance involved it was land " which lies on the east side of Cayuga Lake." The particular lot involved was shown upon a map as abutting upon the lake; there was a beach and boulders, terminating in a rise covered with vegetation, and beyond there was a marsh; the defendants were claimed to be trespassers upon the beach. The direct question involved was to what point did the title under the grant carry, to or into the lake? The decision negatived the rule of the English common law that the title to the soil went to the center of the lake, and, in passing upon the question, the court stated that that question had never been determined in the State of New York, calling attention to the statement of the Supreme Court of the United States in *Hardin* v. *Jordan* (140 U. S. 371, 397), in which the court stated that the argument of convenience was not sufficient to justify the abandonment of the common-law rule. Largely on account of the size of Cayuga lake, the court held that the title did not carry to the center of the lake. There, as here, was expressed the view that there was no analogy between Cayuga lake, where the water changes its level at uncertain and irregular intervals, and the sea coast, where the tide daily ebbs and flows. There, as here, doubt was expressed as to the meaning of high- or low-water mark. " Usually exactly what is meant by these terms is not defined." After considering the various holdings in many jurisdictions, the court stated (at p. 128): " The substantial question remains as to what is the limit of such a grant in our State. Is it the line of ordinary spring floods or the line of low water reached in the dry season? While this court has' never definitely passed upon the question, the current of opinion is that it is low-water mark." The court followed the dictum in the case of *Canal Commissioners* v. *People* (15 Wend. 423), where the Chancellor said that " the common law does not apply to our large fresh water lakes but as to them such a grant as the present takes to low-water mark." It should be noted that (at p. 129) the court stated that " in *People ex rel. Burnham* v. *Jones* (112 N. Y. 597) we noted the concession of both parties that the line of riparian proprietorship along Lake Ontario extends but to high-water mark," but the court expressed no approval of that concession because it was not material to any question involved in the case. The final determination in this exhaustive opinion was that " Under the grant from the State the grantee took to low-water mark on Lake Cayuga." It should be

noted, however, that, in making this final determination, the court said: " Whether in high water the public has not the right of navigation wherever a boat may float we do not decide. Nor do we decide whether ' low-water mark ' means that mark to which the water may sink in extraordinary seasons, or simply at its ordinary and usual low level. Here such a decision is not necessary."

In *Ransom* v. *Shaeffer* (*supra*), where the title to lands bordering on Lake Ontario at Alcott, N. Y., was involved, the official referee was involved in considering an action to which the State was not a party, and interpreting private grants, and stated the problem as being one in which the question was whether the plaintiff Ransom's title is bounded by high-water line or runs to the waters of the lake, whether high or low. Following the analogy of *Stewart* v. *Turney* (*supra*), the referee stated that the only difference between the two cases was the difference in size between Lake Ontario and Cayuga lake, and held that the Ransom title ran to low-water mark of Lake Ontario.

In the case of *Massachusetts* v. *New York* (*supra*) the waters of Lake Ontario were involved; the land fronted upon Lake Ontario within the limits of the city of Rochester; the action involved the interpretation of an Indian grant. The court said (at p. 87): " It does not appear that the Indians ever had or claimed any rights to the soil under the lake or that any attempt was made by Massachusetts or those claiming under it to exercise the granted right of pre-emption with respect to the bed of the lake. Nor is there anything to indicate that either party to the treaty contemplated grants of the soil under the water, or intended any such limitation upon the sovereign rights of New York over navigable waters within its territory, as necessarily would have resulted from the grant in private ownership of lands under water." The court states (at p. 89) the principle of the English common law, that under it " the title to the soil under navigable waters is in the sovereign, except so far as private rights in it have been acquired by express grant or prescription." The court states (at p. 93): " New York has consistently refused to apply the [high-water mark] rule to non-tidal waters, holding that a conveyance ' to the shore ' or ' along the shore ' of such waters carries to the water's edge at low water," and the court sustained, on the particular circumstances of the case, the New York rule. This case is interesting for the reason that in the grant the words " shore " and " lake " were used as synonymous, for where the grant bordered on Lake Erie the grant was " to Lake Erie " and where it bordered on Lake Ontario the language was " to the south shore of Lake Ontario."

It now remains to determine what effect the holding that the plaintiff's title on his westerly boundary runs to a variable low-

water mark has upon the title to Black pond, lying easterly of the lake on the Alverson farm, and to the marsh land lying easterly of the lake on the Boomer farm.

### The Black Pond and the Marsh.

Neither the so-called Black pond nor the marsh are navigable waters. As to Black pond, this was a small pond of shallow water on the so-called Alverson farm, which in its original state had no outlet direct to Lake Ontario; there were some rivulets which drained water into the pond. On this subject the plaintiff testifies that " On the very north corner of the Alverson Farm was years ago what appears to and might have been at some time, but not in my time, an outlet to Black Pond." (Minutes, p. 28.) While not binding, nevertheless, the earliest atlas of Jefferson county, published in 1864, shows the area involved here on page 20, and, while Little Stony creek is shown, there is no evidence of any pond or outlet to the lake from where the pond is located. To the south of Black pond is the marsh land, partially on the Alverson and partially on the Boomer farm. Originally there was an outlet from this marsh through a creek known as Little Stony creek. This Little Stony creek drained a small watershed, having its beginning in the northerly tier of lots ?of the town of Ellisburg and nearly three miles from Lake Ontario, and it flowed thence westerly until it was joined by another stream at a point over a mile from the lake, and into a pond known as Sawmill pond, and then continued southerly and westerly until it emptied into the lake through the sand, past the sand dunes on the so-called Boomer farm; it was purely a surface-water stream, drying up in the late springtime; along this stream, but back from the lake and northerly and southerly of this stream, were the so-called marshes; it may have not only drained these marshes but also, in times of freshet water in the spring, it did drain, either by actual flow or by seepage, part but not all of the water from the so-called Black pond; waters were left which made the pond. Little Stony creek outlet from the marshes and from Black pond was closed, and by reason of that fact the water of the marshes to the south of Black pond were turned into it, and a new outlet was cut from Black pond to Lake Ontario.

No topographical maps covering this area have been furnished to the court, but enough appears to show that Black pond and the marshes were at no time a part of Lake Ontario; nor was the water in them supplied by the water backing up into them at Little Stony creek outlet, from the lake, excepting possibly in times of extreme high lake levels or heavy westerly winds; within the memory of man there never was, until about fifteen years ago (when Little Stony

creek outlet was closed and a new outlet cut to Lake Ontario from Black pond), any outlet from Black pond to Lake Ontario; Black pond was not supplied by a set-back of lake water. As to the depth of this pond, little of value is furnished by the testimony of the defendants' witness, John C. Stenard, a civil engineer employed by the Division of Highways of the Department of Public Works of the State of New York, who took these levels by driving stakes into and through the mud of the pond. It, however, does appear by the testimony of this witness that between November, 1937, and the 22d of February, 1938, he went to Black pond for the purpose of making a survey of water levels; that he made a survey of the bottom of the pond and the marsh; that in so doing he went down as far as he could into the mud; that he took elevations of the ground on the bottom of the pond; that they were all referable to the lake level of 244.35 feet; that he made a map which shows the area of Black pond at that time. Roughly speaking, the pond is round, having a diameter of about 1,000 feet at the time the survey was made. From the pond to the lake the distance, as scaled from the map which this witness made of his survey, is about 800 feet. Little evidence is given as to the making of the new outlet from Black pond to the lake. The mud that they found there did not come from the lake, but the bottom of the mud was generally below the surface of the lake. The water level of the pond at the time was 245 feet, while the water level of the lake was 244.35 feet. This fact is significant in that it shows that Black pond was not at the time supplied by Lake Ontario water, as the level of the pond was higher than the level of the lake.

By closing the outlet of Little Stony creek to the lake by a dam (either natural or artificial), the whole drainage of the marshes of the Alverson farm and of the Boomer farm and of the watershed of Little Stony creek was diverted into Black pond and thence to Lake Ontario through an artificial channel.

As I see it, the reasons for damming up Little Stony creek at its outlet on the Boomer farm and diverting the water of Little Stony creek into Black pond and thence through a new channel dug from the pond to the lake are of no importance here, because, irrespective of these changes, as well before as after they were made, the title to the lands of the marshes and of Black pond was in the plaintiff.

However, the evidence may be of value. Prior to the construction of the new outlet, Black pond would fill up with water in the springtime from surface-water runs, and its drainage was into the Little Stony marsh and thence to the lake, to the extent that it could be drained. The plaintiff shows that there was a ridge of hard land at the south end of Black pond, and that Black pond got so full in the spring that it worked south through this stretch of hard

land right into the marsh, and that Black pond had a different level of water in those days because it had no outlet to the lake; he testifies that fifteen years ago he made up his mind that he could not have any ducks on the Boomer marsh, or any muskrats, if the water was allowed to seep out and run out to the lake through the outlet of Little Stony creek, so he dammed it up with a sand dam and then dug or plowed an outlet from Black pond to the lake; that when this opening was cut through there was a torrent of water that flowed to the lake through it; in other words, he created a new outlet for the drainage of the watershed of Little Stony creek, running from the marshes to Black pond and from Black pond to the lake.

As to Black pond, the plaintiff says further that, prior to cutting this new channel, all summer long Black pond was just a sort of a stinking, frog-spittle, mosquito-infested area, with no outlet whatsoever; that in the spring and winter, that is, at times of high water, it ran to the south. He testifies that even Little Stony creek at times did not go into the lake; that he made a new channel from the marshes by blasting out a strip of land between the marshes and Black pond so that the water would have free access to Black pond; that he has known the Little Stony creek outlet and area for over forty-seven years; that the present outlet is a mile north of the old outlet. He states that his purpose was to put more water into the lower marsh and make it suitable for duck hunting and for rats, and further for clarifying and cleansing and taking the foul stuff out of Black pond, which was near a camp which he owned; that during the summertime, prior to the change, Black pond was a slough-hole, the water evaporating almost down to nothing; stagnant water for about three months of the year.

The plaintiff will prepare findings of fact and conclusions of law in accordance herewith, to be settled upon two days' notice if not agreed to.

Judgment accordingly.