## UNITED STATES v. CERTAIN LANDS IN TOWN OF HIGHLANDS, ORANGE COUNTY, N. Y., et al.

Civ. 4–316.

District Court, S. D. New York.
March 30, 1943.

542

See, also, 48 F.Supp. 303; 48 F.Supp. 306.

John T. Cahill, U. S. Atty., of New York City, Harry T. Dolan, Sp. Asst. to the Atty. Gen., and Edward H. Murphy, Sp. Atty., Department of Justice, for petitioner-plaintiff.

Scott & Sneed, of Newburgh, N. Y. (Charles Sneed, of Newburgh, N. Y., of counsel), for Clara W. Pavek and others.

Kopald & Haft, of Highland Falls, N. Y. (William Haft, of Highland Falls, N. Y., of counsel), for Libbie Motak and others.

John J. Bennett, Atty. Gen. of New York (Warren H. Gilman, of New York City, of counsel), for the People of State of New York.

Ivan E. Maginn, of New York City, for Town of Highlands.

CONGER, District Judge.

This is a proceeding brought by the United States of America to condemn certain lands within the Town of Highlands, County of Orange, State of New York.

The petition alleges that pursuant to and under the authority of Congress the Secretary of War found and determined that the lands mentioned and described in the petition herein are among the lands to be acquired for the public use, that is to say, as additional land in the vicinity and for the use by the United States Military Academy in connection with the present Military Reservation at West Point, New York.

This controversy before me involves the second parcel sought to be acquired in this proceeding, Long Pond, a small body of water consisting of about 39 acres. In its petition the United States alleges that the owners of Long Pond are unknown. The title to the uplands surrounding Long Pond is not part of this controversy. It is the pond itself and the land under the water thereof.

The lands surrounding the pond are owned by Pavek, Gibney and Motak.

The defendants Gibney, Motak and Pavek have each answered the petition; each claiming ownership to the lands under the water of said pond adjacent to and adjoining the uplands owned by each of them. The People of the State of New York have appeared and answered herein and claim title in fee simple absolute to all the lands under water of said pond except a small portion at the southwest end thereof.

The Town of Highlands has also answered and claims a perpetual easement to the road running along the westerly side of the pond.

It was stipulated by all the parties interested that the above issues be tried before me without a jury.

At the outset let me state that the plaintiff herein, the United States, claims no right, title or interest in and to Long Pond or the land under the water thereof, except that it does claim to have some right to control the overflow of the waters thereof.

The first issue to be decided is between Gibney, Motak and Pavek on the one hand and the State of New York on the other.

The state claims to hold the title in fee to the land under water in Long Pond in its sovereign capacity. It claims that it has held such title since on or about July 9, 1776, as successor to the Crown of England.

The individual defendants claim title to the lands under water by conveyance to them and to their predecessors in title. They also claim adverse possession against the state and also invoke against the state the 40-year statute of limitations contained in Section 31 of the Civil Practice Act of the State of New York.

The first problem presented resolves itself into a question as to whether or not the patents and deeds offered in evidence by the upland owners conveyed the lands under water adjacent to the uplands.

Surrounding Long Pond there were five tracts of land. Four of these were granted by the Colonial Government. There is no record of any Colonial or State grant to the fifth parcel. These parcels, at least that portion thereof around the pond, are owned by the individual defendants.

No question is raised by the state as to the title of this upland, but the state contends that this in no way relates to the title of the land under water.

Before taking up each title in detail, it might be well to first set forth the law which governs generally the situation here presented.

A great deal has been written on this subject. One of the outstanding decisions is Gouverneur et al. v. National Ice Co., 134 N.Y. 355, 31 N.E. 865, 868, 18 L.R.A. 695, 30 Am.St.Rep. 669. We find there a situation generally similar to the one at bar. The controversy in that case was over the ownership of a small pond (45 acres) in Putnam County. The only difference being is that there the controversy was between a private person and a private corporation. The general rule of interpretation of grants and deeds is not changed because the state is one of the interested parties. The court laid down the general rule that natural ponds and small lakes are private property; that they pass by grant of land in which they are included; that they are also presumed, if nothing appears to the contrary, to belong to the riparian owners. Then followed an extended discussion of the authorities in other states. The court then stated: "Whatever may be the doctrine applicable to small inland lakes and ponds elsewhere, the presumption in this state is that the land under their waters belongs to the proprietors of the adjoining lands. Smith v. City of Rochester, 92 N.Y. 463 [44 Am.Rep. 393]. Such is the common-law rule in the states where the grantees of land so situated and described by boundary, in grants on or along such waters, take to the center."

We find this question again discussed by the Court of Appeals in White v. Knickerbocker Ice Co., 254 N.Y. 152, 172 N.E. 452, 453, 74 A.L.R. 591. The controversy arose over the ownership of land under water of a lake one mile long and three-quarters of a mile wide (Rockland Lake). The following excerpts from that case state the general rule better than any words of mine: "Where a grant is so framed as to touch the water of a river, and the parties do not expressly except the river, one-half of the bed of the stream is included by construction of law. The value, such as they have, of small non-navigable lakes and ponds, as a general rule, is mainly in their relation to adjacent lands. If the parties mean to exclude the land under water, they should do so by express exception; the restriction ought to be framed in very plain and express words. Gouverneur v. National Ice Co., supra; Seneca Nation of Indians v. Knight, 23 N.Y. 498, page 500. The rule which has been continuously followed is best expressed by Cowen, J., in Luce v. Carley, 24 Wend. 451, 35 Am.Dec. 637: 'Where the grant is so framed as to touch the water of the river, and the parties do not expressly except the river, if it be above tide, one-half the bed of the stream is included by construction of law. If the parties mean to exclude it, they should do so by express exception. Without adhering rigidly to such a construction, water gores would be multiplied by thousands along our island (inland) streams small and great, the intention of parties would be continually violated, and litigation become interminable.'"

The rule reiterated in all the cases is that a grant of land adjacent to a small lake carries title to the center thereof, unless the presumption is negatived by express words or by such a description as clearly excludes it from the land conveyed.

See Fulton Light, Heat & Power Co. v. State of. New York, 200 N.Y. 400, 94 N.E. 199, 37 L.R.A.,N.S., 307; Stewart v. Turney, 237 N.Y. 117, 142 N.E. 437, 31 A.L.R. 960.

Having thus expressed the general rule, I shall now take up each individual tract involved in this proceeding, subjecting each to the rule above stated.

### The Gibney Tract.

The source of the Gibney title is a patent by King George III to William Smith and Edward Wilkins, dated April 15, 1768. The course contained in the grant in so far as it refers to Long Pond is as follows: "Beginning at a maple tree marked with three notches and with the letters E W N C, standing at the Northeast corner of a pond of water, known by the name of The Long Pond" and this tract runs from the said maple tree "to the aforesaid pond called The Long Pond, then along the east end of the said pond as it runs to the place where this tract first began."

Down through the years the conveyances have substantially followed the language of the original patent, to and including the Gibneys.

The words of the first course of the description of the property "Beginning at a maple tree * * * standing at the Northeast corner of a pond of water" are not words of restriction or limitation as the monument could not conveniently be placed in the water of the pond. Such a line indicates the place of the line or its intersection with the water and not the end of it. Fulton Light, Heat & Power Co. v. State of New York, supra; Luce v. Carley, 24 Wend. 451, 35 Am.Dec. 637.

The other pertinent words in the description "to the aforesaid pond" and "along the east end of the said pond as it runs to the place where the tract first began" are not such a restriction so as to exclude lands under water from the adjacent lands. Such a description carries title to the center of the pond. White v. Knickerbocker Ice Co., supra; Gouverneur v. National Ice Co., supra.

### The Motak Tract.

The source of the Motak title was a patent from King George III to Thomas Moore and John Osburn, dated March 14, 1775.

The courses of the description of the property in the patent in so far as they are pertinent to Long Pond are as follows: "Beginning at a maple tree standing at the northeast end of a pond of water commonly called and known by the name of The Long Pond, which maple tree is marked with the letters and figures N C S M and is a corner of a tract of 1385 acres of land granted in the year 1768 to William Smith and Edward Wilkins * * * to the aforesaid Long Pond, thence along the said pond to the place where this tract first began."

The language of the patent clearly indicates an intention not to restrict the grant to uplands alone but to carry also the land under water adjacent thereto. The same reasoning which applies to the construction of the patent in the Gibney tract applies here and the same cases are authority for my holding.

In its brief the Government contends, however, that Motak may not claim any title to the lands under water because in the next conveyance after the original grant the description differs from that contained in the patent with reference to the courses along the pond (Sands to Kronkhyte, March 25, 1809). The first course in the second conveyance begins at a maple tree standing on the north bank of the pond. The last course again differs in that it runs along the north shore.

I do not regard this change of description as being of particular importance; the second course still runs "to the pond". It should be noted also that in the following deed (Kronkhyte to Kronkhyte, May 31, 1809) the first course is exactly similar to the first course in the description in the patent. The discrepancy would seem to be but a matter of loose conveyancing.

There is a hiatus in the chain of title. There is no record of any conveyance out of the patentees. The first deed of record is the deed from Sands to Kronkhyte, supra. The State of New York may not take advantage of either the change of description or the hiatus in the record. The State of New York was divested of any right or title by the patent itself, which in my opinion granted not only the uplands but the land under water adjacent thereto. The United States Government in its brief urges that the land under water, not having been conveyed by the original patentees, is now owned by the State of New York by escheat. The State, however, makes no such claim. In

order to prove title by escheat, there must be some proof that the original patentees died without heirs. No such claim has been advanced or testimony offered.

 If the title to the land under water by reason of the above set of circumstances was never conveyed by the original patentees, I am satisfied that the present owners (Motak) have acquired title against any individual claimant by adverse possession.

### The Pavek Tract.

The Paveks own most of the uplands around Long Pond. They obtained title by two deeds, one in 1885 and the other in 1893. There is no dispute as to the title to the upland. As stated before, the issue is the ownership of the lands under water adjacent to these uplands.

Part of the property of the Paveks is within the bounds of four Crown patents.

A. John Neilson Patent—1752

B. Vincent and David Mathews Patent—1761

C. Smith and Wilkins Patent—1768

D. Moore and Osborn Patent—1775

There is one portion of the Pavek land which cannot be traced back to a royal grant or patent.

The chain of title out of the patentees is not entirely complete but at least the source of title has been well established.

The simplest way to take up this question is to start on one side of the pond and go around the shoreline.

### The Southeast Shoreline.

 This line was all included within the original patent to Neilson and the original patent to Mathews.

The pertinent course in the Neilson patent reads as follows: "then North 2 degrees and 30 minutes west 70 chains to the south side of a pond called the Long Pond having a large rock in the middle of it, then crossing said pond north 80 degrees west 50 chains."

It seems to me that under the decisions quoted above there can be no question as to the ownership of the land under water under this grant. Here the land contemplated by the grant not only bounded the water but actually crossed it. Part of this end of the pond was within the Neilson patent not by presumption but by actual grant. The words in the grant are not words of exclusion but actually convey title to the land under water.

 The pertinent course of the Mathews patent is as follows: "and then North two Degrees and thirty Minutes West, Seventy Chains, to the South side of a Pond called the Long Pond, then partly along the Banks of the said Pond North, fifty five Degrees East, sixty Chains, then South one Hundred and seventy nine Chains to the aforesaid Tract of Land granted to the aforesaid, Sarah, Catherine, George, Elizabeth and Mary Bradley, * * *".

This presents a somewhat different situation but a study of the old records convinces me that the Crown never intended to exclude the bed of the adjacent pond from the patentees. "Partly along the banks of the Pond" seems to me clearly indicates that part of the line went through the water of the pond. The grant did not solely describe dry land.

I am confirmed in this by a map made in 1807 and filed as part of a record in a partition action. One of the parcels partitioned and set off has for its northern line the course here in question. The commissioners in their report to the court stated that they had made an accurate survey of the premises and that the same "is laid down in the said map or chart hereunto annexed signed by us". This map (Exhibit H) shows this disputed course running not along the bank but along the bank partly and through the water partly.

The words "to the south side of the Pond" carry the line to the water. Any other interpretation would be highly artificial. White v. Knickerbocker Ice Co., supra.

I can only conclude that there was no intention to exclude the adjacent land under water of the pond from these patentees. There are certainly no clear words in the description which restricts the grant to dry land alone.

### The Northwest Shoreline.

The Pavek land on the northwest side of the pond has two sources of title. The first is a one-acre parcel which came out of the Moore and Osborn grant of 1775. The title to this parcel comes from the same sources as the Motak title. The line of that patent reads generally "to the pond" and "along said pond". I make the same ruling as to the ownership of the

land under water adjacent to this one-acre parcel of the Pavek's as I did of the Motak lands.

The last disputed line has to do with the greater part of the northwest shoreline of the pond. To this parcel there is no grant of record either from the Crown or the State of New York. It must be conceded that the State of New York has never issued a grant of lands under water adjacent to this tract of land.

The first deed of record is from Henry Mansfield to Ezekiel Hubble dated March 22, 1814 and recorded June 24, 1818 in the Orange County Clerk's Office. There is nothing in the deed to indicate the source of title.

■ I cannot conclude that because no patent or grant to this parcel of land has been found that, therefore, there was none. I know from an experience of many years that in the early days deeds were not always recorded. When a transfer of title took place the old deeds (unrecorded) were passed along to the new owner. I cannot conceive that any such harsh and arbitrary rule should be applied.

■ An examination of old records and documents (exhibits in this case) rather convinces me that there was undoubtedly a patent or grant from the Crown of this parcel in question. (See exhibits 51, 52, O, Q, 55 and 57).

Under the circumstances, I feel that, in passing on the question of the land under water adjacent to the property, the description in the deed from Mansfield to Hubble should control.

■ The pertinent courses in this description, in so far as the pond is concerned, are: "Beginning at the northeasterly edge of the pond called the Long Pond * * * and thence South * * * to said Long Pond * * * thence along the northwesterly edge of said Long Pond to the place of beginning". I am satisfied that these words show a presumption to convey title to the land under water adjacent to the uplands conveyed. Certainly this presumption is not negatived by express words or by such a description as clearly excludes it from the land conveyed. White v. Knickerbocker Ice Co., supra.

There can be no question about the words "to the Pond". The words beginning at the edge of the pond and thence along the edge of the pond presents a borderline proposition if they are to be considered alone but certainly when coupled with the course "to the Pond" one cannot say that they are such express terms as to exclude the land under water from the adjacent lands conveyed.

It would serve no useful purpose to discuss the various conveyances in the Pavek chain of title. The chain is not entirely complete. I assume that the Paveks have good title to the uplands. Neither is it necessary to discuss the language in the various deeds. There is some variance from the language of the original grants. The state may not take advantage of this. The title to the lands under water by the patents was vested in the original patentees. The state may not now claim title to these lands.

■ In connection with another issue herein the Government contends that it appears from an examination of the deeds, DeWitt to Vought and Vought to Pavek, that there is a discrepancy in the acreage and the Government, therefore, claims that the Paveks have no record title to a tract of land at the outlet of Long Pond. This parcel is not along the shoreline and does not affect the claim of the state. I really am not trying the title to these lands but I do find that the Paveks have had possession of this parcel, open and notorious, under claim of title for over forty years. They have at least title by adverse possession.

As to the ownership of Long Pond and the land under its surface. Forgetting for the moment any arbitrary judicial interpretation of the various courses in the description of the land conveyed around Long Pond, I am convinced that the Crown never intended to reserve to itself the land under the waters of Long Pond. I am confirmed in this by a reading of the old documents in evidence. Land was plentiful. The Crown was rewarding its faithful followers by these grants of farm and wood land. The pond was of no value to the Crown. The land was sparsely settled. These grants may very well have been intended to open new lands and new farms. The water was of great value to these early settlers. The grants around this pond and in the neighborhood indicate a scheme to give to these settlers the land and also whatever water grants were possible. In neighboring grants ponds were included therein. I am satisfied that the Crown did not make an exception to Long Pond. The

line of one patent crossed the pond, leaving part of the pond within this patent (Neilson). In another (Smith and Wilkinson), one of the lines of this patent instead of being straight is deflected so that the next course went to the pond. Had this line gone straight, this patent would not have touched the pond. As the result the northwest course of this patent has a horn or projection in it so that it takes in the pond.

It does not seem reasonable that had the Crown intended to reserve to itself the land under Long Pond, it would have included part of the pond within the Neilson patent.

In answer to the claim of the state herein, that it owns the land under water of Long Pond except a small portion at the southwestern end thereof, the individual defendants set up by way of defense the statute of limitations, Section 31 of the Civil Practice Act of the State of New York, which reads as follows:

"§ 31. When the people will not sue. The people of the state will not sue a person for or with respect to real property, or the issues or profits thereof, by reason of the right or title of the people to the same, unless either

"1. The cause of action accrued within forty years before the action is commenced; or

"2. The people, or those from whom they claim, have received the rents and profits of the real property or of some part thereof, within the same period of time."

 If this statute is to be strictly construed and construed in accordance with the plain language of the statute, the claim of the state did not accrue within forty years before the commencement of this proceeding. Whatever claim the state has came into being with the organization of the state in 1777. Generally the statute of limitations does not run against the state, but here the state has elected to come within the statute of limitations.

 Lands of a sovereign state may not be lost or taken from it by failure to assert its title, unless there is an agreement on the part of the state not to sue. And after such a statute has been passed by the state, it cannot lose such lands as it holds for the public in trust for a public purpose, such as highways, public streams, canals, and public fairgrounds. People v. Baldwin, 197 App.Div. 285, 188 N.Y.S. 542. Here we have an agreement not to sue,

Section 31 of the Civil Practice Act. We have also the bed of a small inland pond, non-navigable, with its outlet concededly not owned by the state, surrounded on all sides by the lands of the individual claimants herein.

 Lands under water do of common right belong to the owners of the soil adjoining to the extent of their lands in length. There is a different rule applied to arms of the sea and rivers where the tide ebbs and flows. There the ownership of the citizenship is of the whole river or water, the soil, etc. Fulton Light, Heat & Power Co. v. State of New York, supra; Smith v. City of Rochester, 92 N.Y. 463, 44 Am.Rep. 393.

 It would tax the imagination to find that the state was holding this pond and the soil underneath for the public. The state never exempted the pond from taxation as public lands or made any claim that it claimed ownership of the pond for its citizens and now only makes it since the commencement of this condemnation proceeding.

There is no proof that the state has received any of the rents and profits of the real property it now claims. There is no positive proof but by inference one can only conclude that it never did. The individual owners have used the pond, paid taxes and exercised ownership over it for many years, much more than forty.

The fact that the state has received no rents and profits from the claimed land is not entirely conclusive. Under certain circumstances it may be deemed to have received them. It has been held that one may occupy state lands and the state not receive any income therefrom and still the state would not be barred from claiming the land. In that case the occupant retained the rents and profits, not as a right but as a gratuity. That does not obtain, however, where the land has been held in hostility to the state's title for over forty years. People v. Arnold, 4 N.Y. 508.

I quote from that case, as it expresses exactly my views on this question: "I have not stopped to notice the admitted doctrine that the people can not be disseized, nor to inquire whether there can be a technical adverse possession against them. What we mean to say is, that to constitute a bar, there must be such a holding for forty years as would constitute a good adverse

possession if the land had been owned by an individual, instead of the state."

The individual claimants here have had such possession for more than forty years under claim of title. Combined they encircled the pond. They have paid the taxes. The pond was fenced in by substantial enclosures (not of course around the edge of the pond, which is not necessary). The boundary fences between owners ran out into the pond; they used the pond to water their cattle; they harvested ice from the pond; they used the pond in conjunction with their ownership of the shore of the lake for private bungalows, docks, floats, etc. They prohibited use of the pond to the public without permission; posted signs to that effect. Land was leased with the privilege of using the pond.

I hold that these individual claimants have established actual, hostile, open, notorious, exclusive and continuous possession of the pond for over forty years and that, therefore, the state is estopped from setting up any claim to the land under the water of Long Pond; that the cause of action herein did not accrue within forty years before the commencement of this proceeding and that the state, or anyone from whom it might claim title, has not during said period of forty years, received the rents and profits of the real property involved or from any part of it.

### The Staats Patent.

The Government offered proof concerning the Staats patent.

In 1712 Samuel Staats received a grant of land on the Hudson river from Queen Ann. This grant called for 400 acres of land together with a small strip of land described as follows: "Together with a small slip of land four chains broad on each side of a fall of water that falls into a small run of water that comes into Hudson's River just below the meadow at the said John Canton Hook and up against the stream of the said fall of water over the top of the said mountains to a pond of water and round the said pond keeping still the said breadth of four chains broad."

At the trial the Government contended that the "pond of water" above referred to could only have been Long Pond. That would mean that there was granted to Samuel Staats a strip of land around Long Pond four chains wide. In its brief the Government does not quite go that far but does contend that this small strip so granted to Staats sheds some light on the issue here, i. e. the ownership of the land under the water of Long Pond.

There is no evidence before me which would justify me in holding that the Staats patent in any way affects Long Pond; were I to do so, I would be indulging in surmise and conjecture. It is not necessary herein for me to determine just where this small slip of land was located with reference to either the north or south boundaries of the Staats grant. There is not a scintilla of evidence from which I could conclude that the small pond mentioned in the grant was Long Pond. There is every reason to find the contrary. An examination of the various titles from the early days down fails to disclose that anyone ever claimed to own or possess a slip of land four chains wide around Long Pond.

The surveyor's return of the Staats grant shows the pond on the map as being very close to the river. Long Pond is some three or four miles from the river. If the surveyor had intended to include Long Pond in the grant, he would not have designated the supplemental grant as a "small slip of land". It would have been much more than that.

Had it been intended in the Staats grant to include a strip four chains wide around Long Pond, certainly in 1752 one would not reasonably expect another grant (Neilson) to include within its bounds a portion of Long Pond.

### The Mill Property.

The Government contends herein that it has some rights or privileges to the waters of Long Pond by reason of its acquisition of the Mill property on Popolopen Creek. They assert this right by reason of a deed to the Government from Charles F. Roe, dated June 17, 1905.

This property consists of a tract of land of fifteen acres designated as the Fort Montgomery Mill Property. The deed also contains certain rights and privileges to Popolo Pond and also the following: "and also all the lands, rights and privileges which she (Anna B. Phelps) had or owned at or near the outlet of the Long or Kronkhyte Pond."

The problem is to ascertain whether or not there were any rights or privileges in connection with Long Pond in the grantor and what those rights and privileges were.

It will be unnecessary to refer to the various conveyances constituting the chain of title to Roe except generally.

The first document of any kind relating to this right in Long Pond was dated in 1812 and is in the nature of an indemnity agreement. This recited generally that G. Sheldon and M. Lamoreaux had by an instrument bearing equal date (August 20, 1812) executed by them and to be executed by James Davis and James Wygant sold "a certain strip or piece of land at the outlet of Long Pond or Kronkhyte's Pond" to John Suydam and Henry I. Wyckoff; that they had been paid $400 as the consideration therefor; that Peter Lamoreaux, Jr., had died seized of the property; that the Surrogate of Orange County had made an order to sell the property of said Lamoreaux to pay his debts of $1,500; that property had already been sold to the amount of $1,400; that it was impossible to sell any further property which would not be in excess of $100; that, therefore, in this conveyance the purchase price was put in as $100 whereas it was actually $400. This instrument states it was given to indemnify the two said purchasers from any claim of damages by reason thereof. In this same document there is an original assignment from Wyckoff to Suydam of all his right and interest in said document. The assignment stating that Suydam had purchased from Wyckoff the strip of land mentioned in the indemnity agreement.

There is no record that Davis or Wygant ever executed the deed. No one can say just what happened.

The next instrument we find of record is the deed from the executors of John Suydam to James Miller, dated August 26, 1847. This deed conveys a number of parcels and the following: "and also, all the estate, right, title and interest of the heirs and devisees of the said John Suydam of, in and to a certain strip or piece of land at the outlet of a Long Pond, or Kronkhyte Pond, in the Town of Cornwell and County of Orange aforesaid, and whereof Peter Lamoreaux Junior died seized, and which was conveyed by G. Sheldon and others to the said John Suydam and Henry I. Wyckoff."

The executor of James Miller conveyed to Thomas Coleman various lands including the parcel hereinbefore described under practically the same description.

Anna Phelps, daughter of Thomas J. Coleman, conveyed this parcel to Walter Anthony under the following description: "also all the lands, rights or privileges which she has or owns at or near the outlet of the Long or Kronkhyte Pond."

From then on various deeds including the deed to the United States attempting to convey this property used practically the same description as the deed from Phelps to Anthony.

Whatever right the Government has through the acquisition of the real property to the waters of Long Pond is dependent on its ownership of the aforesaid strip of land.

In one of the deeds (Miller by executors to Coleman) this parcel is described as containing about forty acres of land more or less.

Just what became of this forty acre parcel I am unable to determine. Neither am I able from the evidence to ascertain just where it is in reference to Long Pond. No, one including the Government, has attempted to identify it. It may very well be that the two mentioned in the indemnity agreement of 1812 did not sign the deed. The language of the deeds in which mention of the parcel is made is rather significant. Each deed in the chain of title is careful to grant only such rights or title or interest as the grantor may have had.

In none of the deeds is there any description of the parcel by boundaries. The location of the parcel is not mentioned except that it is "at or near the outlet of Long Pond". Just where in the outlet of Long Pond this parcel is supposed to be no one apparently is aware.

There is no proof of user or possession of the parcel by anyone in the chain of title or by anyone in fact.

■ Under the circumstances, I feel that any right to Long Pond based on ownership of this mythical parcel of land has not been sustained. The Government has failed to meet the burden to sustain its claim that it has a right to control and maintain the uninterrupted flow of the water of Long Pond in its natural channel and to prevent its diversion, pollution, contamination or use by virtue of the rights and privileges conveyed by Roe to the United States by the deed dated June 15, 1905.

I have now disposed of all the issues presented to me in this proceeding except one.

■ The Town of Highlands claims an easement over the bed of an old dirt road

on the Westerly side of Long Pond. This has nothing to do with the original issue, i. e. the title of the lands under water of Long Pond. All the parties agreed, however, to try out this collateral matter in this proceeding. My decision herein in no way shall give the Town any right to the land under water. The Town makes no claim in this respect. With that reservation in mind, I shall pass on the claim of the Town.

The old records and testimony of old residents of the Town discloses that from the early days the road from the Village of Highland Falls to Central Valley ran along the westerly side of Long Pond. The road followed the shore of the pond. This was so until the year 1914 when the new state highway was built. This new highway generally followed the old road, except that near the southerly end of the pond the state road left the old road and rejoined it further on. This left a spur of the old road for about 1,000 to 1,300 feet. It is this spur of the road which is in dispute. Prior to 1914 there is no question but that the Town had an easement for highway purposes. They have never abandoned it but have kept it open in opposition to the adjacent owners. On several occasions the Paveks (adjoining owner) made application to the Town to close the road, which was refused. This spur has beep kept open at both ends. The Town has worked the old road in the spur each year down to the present. There is evidence that the public to some extent still travel over this road. I find that the Town never abandoned the use of the road.

I am satisfied that the Town of Highlands still has an easement for highway purposes over the bed of the old road, which is the loop or spur of the old road from the state highway adjoining.

I am unable to find from the evidence exactly how wide the old road was or is. It is somewhere between ten and fourteen feet.

Just what use the Town and the public may make of this old road except to travel over it, I am not concerned with. I do find, however, that no part of the road went into the pond.

I, therefore, find that:

(1) The People of the State of New York have no title to Long Pond or any part of it;

(2) Title to this water of Long Pond and the land under the water of Long Pond are in the adjacent upland owners.

(3) The Staats patent does not affect Long Pond.

(4) The People of the State of New York are estopped from making any claim to the lands under the water of Long Pond and to the waters of Long Pond.

(5) The United States of America, by the deed from Roe, did not acquire any right to control and maintain the uninterrupted overflow of the waters of Long Pond in its natural channel and to prevent its diversion, pollution or contamination except such rights as it has or may have as a riparian owner by reason of its ownership of the mill property site proper which was not before me.

(6) The Town of Highlands has no interest in the subject of this litigation, i. e. the title to Long Pond and the land underneath its water; it has an easement for highway purposes over the bed of the old road on the west side of Long Pond.

Let judgment be entered in accordance with the above.