THE PEOPLE OF THE STATE OF NEW YORK et al., Plaintiffs, *v.* SYSTEM PROPERTIES, INC., et al., Defendants.

Supreme Court, Trial Term, Essex County, September 4, 1947.

Nathaniel L. Goldstein, Attorney-General (Arthur W. Matt-son, James G. Austin, Donald C. Glenn and Elias M. Schwarz-bart of counsel), for People of the State of New York, plaintiff.

Richard D. Moot for Irving Langmuir and others, inter-veners, plaintiffs.

LeBoeuf & Lamb for System Properties, Inc., defendant.

Breed, Abbott & Morgan for Lake George Association, defendant.

Edward R. Waite for County of Washington and others, defendants.

Beecher S. Clother for County of Warren and others, defendants.

Albert Krakes for County of Essex, defendant.

Sheldon F. Wickes for Town of Ticonderoga, defendant.

John W. Whiteley for Village of Ticonderoga, defendant.

F. Morse Hubbard for Elizabeth G. Brereton, defendant.

RYAN, J. This action was instituted by the plaintiff, People of the State of New York, hereafter referred to as State, against the defendant, System Properties, Inc., hereafter referred to as System. Subsequent to the service of the summons and complaint and before trial, the several other parties included

in the above title were permitted to intervene, as either plaintiffs or defendants.

The underlying and basic issue of the law suit involves the title to a dam, hereafter referred to as Dam " A ", which is located in the Ticonderoga River. The title to Dam " A " is claimed by System, which now and for many years past, has controlled and operated it, either directly or through its agents and tenants, and its predecessors in title. All of the parties to this litigation have one interest in common, and that is a judicial determination of ownership of Dam " A ", and the river bed upon which it stands.

Aside from this one common cause, all the parties have divergent interests and are each seeking varied forms of relief. To enumerate here chronologically the prayer of each of the parties as set forth in the respective pleadings would require time, space and repetition unwarranted by their bearing on the issues involved. Suffice to point out that the plaintiff State is seeking a judicial determination declaring it to be the owner in fee of the bed of Ticonderoga River, and restraining the defendant System from continued operation and control of Dam " A ", and the consequent fluctuation of the water level of Lake George. The plaintiff interveners, adopting an original demand of the State, go further and demand the removal of Dam " A ". The defendant interveners, while not primarily concerned with the question of title, seek a judicial determination which will in effect stabilize for all time, the control and operation of Dam " A ", as that function affects the water level of Lake George.

The defendant System contends that it owns the fee to the bed of Ticonderoga River at the site of Dam " A ", having succeeded thereto through mesne conveyances that have their source in an original patent or grant from King George III of England to Major John Stoughton, a veteran of the French and Indian Wars, which patent or grant is dated July 24, 1764. System further seeks to support its claim of title by establishing a prescriptive right, alleging that it or its predecessors in title have occupied this dam site for approximately 150 years, continuously, openly and notoriously, thereby confirming its record title through title by adverse possession.

To reach a determination of the title to the bed of Ticonderoga River at the site of Dam " A ", it is necessary at the outset to establish the limits and character of this river. Where does it begin and where does it end? Is it an independent body of water, distinct from Lake George which it empties, and Lake

Champlain into which it flows, or is it merely an integral part of both bodies of water with which it is associated? Is it navigable or is it nonnavigable? These are questions, the answers to which are pertinent to a determination of the question of title to Dam " A ". It is conceded that Lake Champlain is navigable in fact and in law, and that Lake George is navigable in fact. It therefore follows that Lake George is navigable in law. " ' The courts have generally adopted the rule which is alike that of the common and of the civil law, that *navigability in fact is navigability in law.*' " (*Waterford El. L., H. & P. Co.* v. *State of New York*, 208 App. Div. 273, 276, affd. 239 N. Y. 629.)

We approach a discussion of the issues of this case with the fact established, and conclusion reached, that Lake Champlain and Lake George are each navigable in fact and navigable in law.

Ticonderoga River, sometimes referred to as Ticonderoga Creek, empties Lake George into Lake Champlain, and its total length is approximately three and one-half miles. From its source to its mouth it drops approximately 221 feet, and a considerable portion of its length is comprised of a series of precipitous falls and rapids. Its origin, recognized and accepted as such as early as 1758 by Governor Pownal, is situate at a point called and referred to as Natural Dam, which constitutes the northern extremity or foot of Lake George. Natural Dam is a natural rock formation or ledge extending from shore to shore over which flows the surplus water of Lake George which constitutes the source of Ticonderoga River.

From this point of origin the river flows in a generally northerly direction for a distance of approximately three-fourths of a mile until it reaches the brink of the first falls, at which point is located Dam " A ". For this distance the present depth of the water, accentuated by the presence of Dam " A " is capable of transporting small boats with limited draft upon its surface. Access from Lake George to this portion of the stream is afforded by the channel or channels through the rock formation referred to as Natural Dam. It is a conceded fact that the channel or channels passing through Natural Dam at some time in the early history of the country, was dynamited, presumably for the purpose of facilitating the passage of logs from Lake George into the river. This fact gives rise to the logical inference that the passages through and over Natural Dam in their original state and condition were not of sufficient depth or flow to permit the passage through it by boats of any

size, except possibly at stages of high water. It would appear to create the further inference that the flow of water from the lake into the river, except at flood stage was not considerable, and until those waters were impounded by the presence of a dam at the head of the first falls, the river in this area was not capable of transporting any types of boats upon its surface. The journal of Charles Carroll described the condition in the spring of 1776 in the following words: "There are two places where the lake is considerably contracted, one about the middle of it, the other, as I have said, at the north end; this last gradually contracts itself in breadth to the size of an *inconsiderable river*, and suddenly, in depth, to that of a *very shallow one*". (Italics supplied. Journal of Charles Carroll, p. 68.)

Nor is there any proof that even logs could ordinarily be floated on its surface until after the white settlers through artificial means increased the flow and the depth of the water. It therefore follows logically that the Ticonderoga River, "' in its natural state and its ordinary volume of water '" was not capable "' of transporting, in a condition fit for market, the products of the forest or mines, or of the tillage of the soil upon its banks.'" (*Waterford El. L., H. & P. Co.* v. *State of New York,* 208 App. Div. 273, 277, *supra.*)

"Rivers are navigable in fact when they are susceptible of being used in their *ordinary condition* as highways of commerce." (Emphasis supplied. *People ex rel. New York Central R. R. Co.* v. *State Tax Comm.,* 258 App. Div. 356, 367.) The Ticonderoga River or Creek from its source at the Natural Dam to a point below the so-called lower falls, which distance comprises better than two-thirds of its total length was not susceptible in its ordinary condition for use as a highway of commerce. The record emphasizes its unavailability for such purpose by repeated reference in historical documents to the "carry or portage" from the foot of Lake George to a point north of the lower falls. That this was the condition existing for many years following the erection by the French of Fort Carillon in 1755 (later Fort Ticonderoga) at the head of Lake Champlain is amply born out by the historical documents and other evidence submitted upon the trial.

The process of reasoning leaves us with the inescapable conclusion that this body of water, in its natural state some three and one-fourth miles long, was capable of transporting boats upon its surface only from a point below the so-called lower falls to the waters of Lake Champlain, a distance of less than one mile. To conclude on this basis that Ticonderoga River

is a navigable body of water, would necessitate the substitution
of fiction for fact, and would constitute a direct contradiction
to the observation of Mr. Justice KELLOGG in the *Waterford*
case (*supra*), quoted by counsel for State (p. 281): " * * *
the navigability of the Hudson rests upon the solid ground of
fact rather than upon judicial pronouncements of a dogmatic
nature."

Nor can this court concur in the view that the Ticonderoga
River, though actually nonnavigable, is navigable in fact
because it constitutes the outlet of Lake George, a concededly
navigable body of water. Such a conclusion would require the
creation of an imaginary line of demarcation between Lake
George and the Ticonderoga River for that placed by nature
at the site of Natural Dam, or it would require the conclusion
that Lake George flows directly into Lake Champlain. Counsel
submit no authorities to sustain this seemingly novel position,
and though counsel stresses the decision in *Niagara Falls P.
Co.* v. *Water P. & C. Comm.* (267 N. Y. 265) as a precedent
for this court to follow in the present case, the navigability
of the Niagara River is not predicated upon the fact that it
empties Lake Erie into Lake Ontario. It is therefore, the
conclusion of this court that the Ticonderoga River is a non-
navigable body of water in fact, and consequently is a nonnavi-
gable body of water in law.

Having reached this determination, it follows that the rule
of law as laid down in the numerous decisions of the courts of
this State governing the rights and title of riparian owners of
nonnavigable streams must apply to this case.

" That in the construction of grants of lands bounded on
small and unnavigable streams, the owner of the banks takes
*ad filum aquae*, as decided in *Ex parte Jennings* (*supra*)."
" His boundary extending to the said river, and thence down
the stream thereof, would necessarily carry him to the thread
of the stream, unless the river be of that character which con-
stitutes the State the owner of the bed thereof * * *."
(*People ex rel. Loomis* v. *Canal Appraisers,* 33 N. Y. 461,
464, 480.)

" From an examination of the authorities which I have been
able to consult, I am satisfied that the defendant has a complete
and exclusive ownership of the *Saranac,* from its confluence
with the lake, so far as he has succeeded to the rights of Z. Platt."
(*People* v. *Platt,* 17 Johns. 195, 209.)

" ' Fresh rivers of what kind soever, do, of common right,
belong to the owners of the soil adjacent, so that the owners

of one side have of common right the propriety of the soil, and, consequently, the right of fishing *usque ad filum aquae,* and the owners of the other side the right to soil or ownership and fishing unto the *filum aquae* on their side; and, if a man be owner of the land on both sides, in common presumption, he is owner of the whole river, and hath the right of fishing according to the extent of his land in length  *  *  *.' " (*People* v. *Platt, supra,* p. 210.)

" It is an old and well-settled rule where the grant had no other boundary on the river side but the stream itself, that the legal presumption is that it was intended to convey to the middle of such stream." (*Fulton L., H. & P. Co.* v. *State of New York,* 200 N. Y. 400, 417.)

" ' In our state, there was to be considered, in applying the common-rule law (of England), the extent to which our fresh-water rivers and lakes formed territorial boundaries and the nature of the title acquired under the laws of the state, to whose dominion England had succeeded. In the former case, the rule was, clearly, inapplicable and, in the other case, as I understand the result of the decisions, two of our rivers formed exceptions to the general rule. The part of the Hudson river above the ebb and flow of the tide and the Mohawk river, a fresh-water stream, in grants made to settlers under the Dutch government, were excepted and, upon the English succession, the beds of those waters, never having been conveyed, vested in the crown, as lands not theretofore granted. As to those rivers, the people of this state have ever asserted title, as to unappropriated lands.  *  *  *  I know of no exception in this state to the common-law rule (of this state) of riparian ownership of the beds of fresh-water streams, where not constituting boundary lines, other than the two rivers referred to. If not affected by situation, or by derived title, there is no good reason why the common-law rule should not obtain with respect to our fresh-water rivers.' " (*Danes* v. *State of New York,* 219 N. Y. 67, page 73.)

" Lands under water do of common right belong to the owners of the soil adjoining to the extent of their lands in length." (*United States* v. *Certain Lands in Town of Highlands,* 52 F. Supp. 540, 547.)

It is not disputed that the Stoughton patent conveyed to Stoughton the land on both sides of the Ticonderoga River at, and both above and below the site of Dam " A ". The letters patent in describing the parcel, started at a pine tree standing on the west bank of Lake George, and eventually arrives at

" to the northwest side of the river or waters which empties out of Lake George into Lake Champlain." The description then continues along the banks of said river, and eventually the description returns to the point of beginning, using the banks of the river and of Lake George as a boundary of the parcel patented. In the second part so conveyed, the description is started at a point where the north boundary of the first parcel will cross the river; true, the boundaries throughout the description for the most part, follow the water course " along the banks ". However, there are several exceptions to this phraseology and at one point the description reads, " to the east side of Lake George, then northeasterly along said lake as it runs."

It is not the position of the State that the Ticonderoga River as such was excepted from the conveyance to Stoughton, but rather, that the river itself was not included in such conveyance, and hence passed to the State of New York when it succeeded to the lands belonging to the Crown at the period of the Revolutionary War. The plaintiff State seeks to sustain its position on a legal interpretation of the phraseology contained in the grants, and maintains that the Crown reserved to itself this body of water. That such was the intent of the Crown is doubtful in view of the specific exception contained in the grant, of sufficient land for a public road, six rods wide to run from the landing place to the fort at Crown Point. Had the Crown regarded the Ticonderoga River as a highway of commerce to which it desired to retain title, it would appear only logical that an exception at least as explicit would have been contained in the grants to Stoughton.

" Where a grant is so framed as to touch the water of a river, and the parties do not expressly except the river, one-half of the bed of the stream is included by construction of law. The value, such as they have, of small non-navigable lakes and ponds, as a general rule, is mainly in their relation to adjacent lands. If the parties mean to exclude the land under water, they should do so by express exception; the restriction ought to be framed in very plain and express words. * * * ' Where the grant to the riparian proprietor has no other boundary on the *side* thereof which is adjacent to the river but the stream itself, the legal presumption is that his grantor intended to convey to the middle of such stream. * * * Running to a monument standing on the bank, and from thence running *by the river* or *along the river, etc.,* does not restrict the grant to the bank of the stream.'

" These principles of law as settled by the courts of this State, were summarized by GRAY, J., in *Fulton Light, Heat & Power Co.* v. *State of New York* (200 N. Y. 400, p. 417), and the rule that if the grantor desires to retain his title to the land under water, he must do so by express words or by such a description as clearly excludes it from the land conveyed, was reiterated by ANDREWS, J. in *Stewart* v. *Turney* (237 N. Y. 117, 121).

" The description which runs the boundary *by* the river or pond, or which is so framed as to *touch* the water of the river or pond, carries title to the center thereof." (*White* v. *Knickerbocker Ice Co.*, 254 N. Y. 152, 155–157.)

" Where the grant is so framed as to touch the water of the river, and the parties do not expressly except the river, if it be above tide, one half the bed of the stream is included by construction of law. If the parties mean to exclude it, they should do so by express exception." (*Luce* v. *Carley,* 24 Wend. 451, 453.)

" In *Child* v. *Starr* (4 Hill, 375) the chancellor remarked that ' running to a monument standing on the bank, and from thence by the river or along the river, etc., does not restrict the grant to the bank of the stream, for the monuments in such cases are only referred to as giving the direction of the lines to the river, and not as restricting the boundary on the river.' " (*Gouverneur* v. *National Ice Co.*, 134 N. Y. 355, 366.)

In construing the grants of the Crown to Stoughton, ascertainment of the intentions of the parties is essential. There is no evidence before this court that would indicate that in 1764 the Ticonderoga River had any value as a highway of commerce for the subjects of the Crown. It is affirmatively established that to travel from Lake Champlain to Lake George required a portage from a place at or near the foot of the north falls on the Ticonderoga River to the landing place near the site of the Natural Dam at the foot of Lake George. That this was the only avenue of passage between the two lakes is most conclusively demonstrated by the exception contained in the patent to Stoughton. Had the river been useful or used for this purpose, there can be little doubt but that it would have been excepted in the grant to Stoughton.

" It depends upon the intent of the parties to be gathered from the description of the premises read in connection with the other parts of the deed, and by reference to the situation of the lands and the condition and relation of the parties to those **and other lands in the vicinity, whether the grant extends to**

the center of the road or stream. This is the recognized rule of interpretation, and it is a question of interpretation and intent. * * * There was a reason, therefore, why the grantors might desire to reserve the lane, while the grantees had no perceptible interest in keeping it up as a lane or passageway, and the deeds must be interpreted with the position and intent of the parties in view." (*Mott* v. *Mott,* 68 N. Y. 246, 253.)

The patents to Stoughton, it may be fairly presumed, were granted for two reasons: first, as a reward for his services as a soldier of the King, and secondly, and probably more important, to encourage the establishment of permanent colonies along the northern extremities of the King's domain in America. Ticonderoga River in its natural state was adaptable to the operation of mills and manufacturing pursuits, and its value as a small nonnavigable river was " mainly in [its] relation to adjacent lands." By the widest stretch of the imagination it was not suitable as an artery of commerce. That the Crown intended to convey to the riparian owners every natural facility along this stream in order to enhance colonization and establish permanent settlements, is the only logical inference that can be drawn. It therefore appears to this court that there was neither design nor intent to exclude the bed of the Ticonderoga River in letters patent granted to Stoughton and that title to the bed of the stream, upon which Dam " A " is located, passed with the grants to Stoughton, and through subsequent conveyances to the defendant, System Properties, Inc.

The defendant System is not limited to a legal construction of the Stoughton patents to establish title to the bed of Ticonderoga River at and near the point of Dam " A ". The learned counsel in the reply brief submitted on behalf of the plaintiff State, though contending that the evidence of the existence of a dam prior to 1876 is " sketchy " and " indecisive " concedes that the defendant System has " assembled actual evidence of the existence of a dam " as early as 1798. This court is impelled to disagree with the statement that proof of the existence of a dam prior to 1876 is " sketchy " and " indecisive ". To the contrary, the proof indicates the presence of a dam at the approximate site of Dam " A " continuously from about 1798. True, the evidence is not uniformly conclusive as to each year from 1798 down to the present time, but the proof and the reasonable inferences that may be deduced therefrom persuade this court that a dam of some description has existed at or near the brink of the " first falls " so-called for upwards of 140 years.

The State after conceding the presence of a dam in 1798, and acknowledging that " actual evidence " was presented to establish its existence in 1802, and again in 1828 and 1829, and in 1847 and in 1848, and again in the 1870's, emphasized the lapse between these respective dates. There was considerable evidence in the nature of account books, letters, historical documents, public records, surveys, maps and field notes pertaining thereto, which clearly indicate to this court, not only the presence but the substantial use of a dam between the respective dates above enumerated. Equally persuasive, is the logical inference that the site being well adapted to the construction of a dam and suitable for the development of water power, it is to be presumed that the site's natural facilities would be utilized by the riparian owners not for one or two or a few years every quarter of a century, but continuously.

This court is not persuaded by the argument of the State that it holds sovereign title to the bed of the Ticonderoga River, and hence could not lose the same by adverse possession. To support its contention in this regard, the State cites numerous decisions which it seeks to reconcile with conditions prevailing on Lake George, but the issue of title involved in this litigation is concerned with the bed of Ticonderoga River and not the bed of Lake George. The State completely ignores the implications which result from the action of the State in granting letters patent to General Schuyler. This conveyance most conclusively negates the assertion by the State that it holds sovereign title to the bed of the Ticonderoga River.

It is the considered judgment of this court, that the defendant System by a preponderance of evidence has established that it and its predecessors in title have had continuous, open and hostile possession of the bed of Ticonderoga River at or near the site of the present dam for a period of over 140 years adverse to any and all claims which may be asserted by the State to the bed of this river.

This is an action in equity. (*People* v. *System Properties,* 293 N. Y. 440.) Lake George is concededly a navigable body of water in fact and in law. The evidence submitted to the court on this trial established beyond any question of a doubt that the presence and operation of Dam " A " located in the Ticonderoga River affects the water level of Lake George. It is a fair statement of fact that the presence of the dam creates an artificial water level in the lake from one foot to one foot and a half above the levels that would pertain if the dam was not there. To what extent these levels affect the shore line of

the main land and the islands is in dispute, but that these artificial water levels have a direct effect and bearing upon navigation in Lake George is agreed.

There was considerable evidence submitted by the respective parties to this litigation with respect to the extent which artificial water levels on Lake George affected navigation in relation to the operation of boats both large and small upon its surface, the docks which have been constructed by the shore owners along the water front, many of which were built to conform to prevailing water levels, the placement of warning signals in the nature of buoys, marking the channels in the lake, and the requirements of the defendant System for the economical operation of its facilities on Ticonderoga River. Each of these factors is important in reaching a determination of what levels are best suited to the fullest enjoyment and greatest convenience of all of the interested parties. Also meriting consideration are the interest of the people of the Village of Ticonderoga, who derive considerable benefit from the overflow of Lake George, and from the operation of the mills which obtain their water and power from the defendant System. As has already been pointed out Lake George is a large, navigable and unusually beautiful lake, in which the public has great interest, and from which it derives immeasurable enjoyment — fishing and swimming in its water, boating upon its surface, and camping upon its shores. It will be the endeavor of this court to reconcile these various and varied interests insofar as that is possible, and to that end, to determine what lake levels are best calculated to serve these purposes.

There is located on the shore of the lake designated as Roger's Rock, a gauge which registers the varying lake levels. This gauge was repeatedly referred to, and was ostensibly accepted by all parties as an accurate agency for determining the levels of the lake, though the parties were not in agreement as to what constituted adequate and proper lake levels.

In 1935 the defendant System entered into an agreement with the defendant Lake George Association, and this agreement is alluded to in the testimony as the " Gentlemen's Agreement ". By the terms thereof the defendant System agreed to make every reasonable effort to regulate the water level of the lake, so that such level would not exceed 4.0 on Roger's Rock gauge and would not be less in elevation than 2.51 on the same gauge prior to September 15th in each year. An analysis of the conditions which prevailed following the execution of this agreement, indicate substantial compliance with the provisions of

the agreement, with one notable exception which occurred in the year 1941, when the water level of the lake dropped to 2.5 on June 5th and continued to drop from that date on, until September 30th it had dropped to 1.0 on the gauge on Roger's Rock. Concededly unusual climatic conditions prevailed during that year, and the evidence satisfies this court that the condition was not due to irresponsible operation of Dam "A", nor to indifference on the part of the officers of the defendant System.

A study of the hydrographs received in evidence, which indicate the water level of the lake from 1914 through 1944, demonstrate that in ten years out of the thirty, water levels above and below the standards fixed in the "Gentlemen's Agreement" prevailed. A study of the graphs would indicate that not in all of these years were these unusual conditions due to climatic influences, but in some instances were due to a disregard on the part of the then operators of the dam for the rights of the property owners on Lake George.

From the accumulation of exhibits and the evidence submitted, and upon the testimony of the experts produced upon the trial, and the testimony of the shore owners of the lake, it is the judgment of this court, that the most advantageous water levels of Lake George are between 4.0 and 2.5 on Roger's Rock gauge. This permits fluctuation of one foot and a half. It is equally apparent to the court that these levels cannot be maintained throughout each year because of physical factors which intervene. However, I am satisfied that the lake levels can be maintained from June 1st to October 1st between 4.0 on Roger's Rock gauge as a maximum, and 2.5 as a minimum. To attain these levels for this period of time, it will be necessary under some conditions in the spring of the year, to exceed the maximum of 4.0 on Roger's Rock gauge, and it will likewise be necessary, following October 1st, to depress the level of the lake below 2.5 on said gauge.

However, as a general plan of operation, the evidence convinces this court that the lake levels can and shall be maintained between 4.0 and 2.5 on Roger's Rock gauge between June 1st and October 1st, which dates adequately cover the summer season; and from October 1st to June 1st following, the levels may be raised or depressed as it may become necessary to do so, in order to achieve the levels fixed for the summer months, and to satisfy the economic requirements of the defendant System, with due regard for the rights of the permanent residents of shore property.

The court is fully cognizant of the inconstancy of nature, and realizing this fact, is prepared to make due allowance when the water levels fixed herein are not attainable by reason of natural causes, beyond the control of the operators of the dam.

A court of equity is of continuing jurisdiction, and may exercise supervision of compliance with its directives. "Actions of ejectment, and in cases where the property is situated as these islands are, actions of trespass may be repeated again and again, until the sinews of litigation are exhausted, and until the resources, but not the spirit, of the parties fail. This is, perhaps, a defect in the common law system; which is supplied, in certain cases, by the more enlarged and superintending powers of a court of chancery." (*Trustees of Huntington* v. *Nicoll*, 3 Johns. 566, 588.) To accomplish this end, this court is clothed with authority to designate a commission or agent of the court to supervise the maintenance of the water levels of Lake George as provided above, and to enforce compliance with the provisions of this decision.

Practical consideration persuades me that the Superintendent of Public Works of the State of New York is the logical selection for such designation, and he, and his successors in office, are duly appointed as commissioner and agent of this court to exercise supervision and control over the water levels of Lake George in compliance with the directives hereinabove set forth. There is reposed in him authority to permit reasonable fluctuation of the water levels beyond the limits prescribed herein, when in his judgment such a course of action is for the public good, or when climatic conditions unforeseen or unpredictable prevail. The details necessary to place this procedure in operation shall be decided by the Superintendent of Public Works of the State of New York and a representative of the defendant System, subject to the approval of this court.

In view of the above it is not necessary for the court to determine whether the defendant System has obtained a prescriptive right to fluctuate the levels of Lake George, nor is it necessary for this court to determine the equitable doctrine of comparative injury. The defense interposed by the defendant System, that there has been a prior adjudication of the issues involved in this litigation is not supported in law.

This decision is determinative of all of the issues involved in this litigation and of the rights of all of the parties hereto.

Judgment in conformity with this decision may be submitted upon fifteen days' notice, with costs to the defendant System Properties, Inc.